Galbraith *v.* Lunsford.

GALBRAITH *v.* LUNSFORD.

(*Knoxville.*    October  18,  1888.)

1. MARRIED WOMEN.   *Estoppel of, to assert title to realty.   Fraud.*

A married woman may, by acts *in pais*, done without any intentional fraud, estop herself to assert title to her realty against persons misled to their prejudice by such acts.  .

Cases cited and approved: Howell *v.* Hale, 5 Lea, 405; Cooley *v.* The State, 2 Head, 606; Pilcher *v.* Smith, 2 Head, 208; Borham *v.* Turbeville, 1 Swan, 437; Adams *v.* Fite, 3 Bax., 69.

Cited and disapproved: 13 Cal., 494 (73 Am. Dec., 593.)

Cited and distinguished: Dodd *v.* Benthal, 4 Heis., 601.

2. LAND LAW.   *Boundaries.   Estoppel.*

A landowner is estopped to assert title to his true boundary, where he and those under whom he claims, have, for over thirty years, recognized, by mistake, another line—claimed as the true one by the adjoining owners—by making partition to it, calling for it in deeds, and pointing it out to others; *and the adjoining owners, upon the faith of such recognition, have purchased, cleared, and improved up to that line.* And it is not material that the landowners were mutually mistaken as to the true line, and could have discovered it, at any time, by survey.

Cases cited and approved: Houston *v.* Matthews, 1 Yer., 116; Gilchrist *v.* McGhee, 9 Yer., 458; Meriwether *v.* Larman, 3 Sneed, 451; Lewellen *v.* Overton, 9 Hum., 76; Rogers *v.* White, 1 Sneed, 69; Riggs *v.* Parker, Meigs, 49; Yarborough *v.* Abernathy, Meigs, 420.

FROM  KNOX.

Appeal from  Chancery Court  of  Knox  County. H. R. GIBSON, CH.

Galbraith *v.* Lunsford.

Lucky & Yoe and Pickle & Turner for Galbraith.

J. L. Rogers for Lunsford.

Folkes, J.    This is an ejectment bill, the disposition of which was dependent upon a question of boundary.

After answer and proof the cause was submitted to Mr. Jerome Templeton, a solicitor of this Court, as an arbitrator, who was " to hear and decide the same according to the law and the evidence." The award was to be in writing, and was to be made the decree of the Court.

The arbitrator presented his award, wherein was stated his findings of fact and of law, adjudging that the bill should be dismissed.

Complainants excepted to the award upon the ground that the arbitrator manifestly undertook, as he was required by the submission, to decide the case according to law, but that he had misconceived the law, and determined the case contrary thereto upon the facts as found by him.

The Chancellor overruled the exceptions, and entered a final decree making the award the judgment of the court.

Complainants have appealed, assigning as error the action of the court in refusing. to set aside the award, and in entering decree thereon.

Under the submission the arbitrator was judge of the facts and the law, and was not required to

give the grounds of his decision, in which event
it would have been presumed that he had decided
according to law.    But having stated his findings
of fact, it was proper for the court to determine,
on the exceptions presented, whether the conclusions
of law announced by the arbitrator were warranted
by the facts as found, in a case where, by the
terms of the submission, the award was to be in
accord with the law: *Powell* v. *Riley*, 15 Lea, 153.

The proof is not in the record, having properly
been omitted, inasmuch as no question was made, if,
indeed, any could have been made, as to the correct-
ness of the conclusions of fact reached by the arbi-
trator.    We are, therefore, to consider only the
question propounded in the exception to the award,
to wit: that the deductions of law upon the facts,
as found, are contrary to law.

The complainants, in support of their exceptions
in the court below, now advance the following prop-
ositions in their assignments of error in this Court:

"*First*—A line which could be easily ascertained
by survey, and which had been known, and was
lost or overlooked by mutual mistake, was and is
not a doubtful line that could be agreed upon or
fixed, or become a true line, and binding by recog-
nition, because void under the statute of frauds.

"*Second*—Recognition of a line under a mistake of
fact, where it was mutual, and either could have
discovered the mistake by survey or otherwise, is
not binding on either party, and neither party can
set up the mistake against the other by way of

estoppel or otherwise, as mistake is as much that of one as the other, and fault, if any, is equal; and besides, an admission made under mistake will be relieved against in equity, more especially when mistake is mutual.

" *Third*—Recognition of a line not the true one will not divest title to land out of a married woman, nor minor, by estoppel or otherwise, as married women cannot be divested or part with title to land in that way; but more especially when it was by mistake of fact as well upon the part of her adversary as that of her own, and when either could have easily discovered the mistake; nor is such married woman or descendants estopped to set up the truth and recover accordingly, and more especially in a court of equity."

Robbed of their verbiage, the assignments of error are to the effect:

*First*—That the line or boundary, under the facts as found by the arbitrator—there being, as assumed by the assignments, no *bona fide* doubt as to the true line entertained by both parties—was not such a doubtful boundary as could be established by parol or acquiescence.

*Second*—That the doctrine of equitable estoppel does not apply at all to the facts as found.

*Third*—And if applicable, it cannot be effectual as against married women.

Before disposing of these propositions let us see what are the findings of the arbitrator, as shown by the award itself. We quote:

"AWARD.

"Without going into the details of the proof, I find as follows:

"*First*—The south boundary line of grant No. 18,417 to William Cox, issued October 3, 1833, is the line from 'F to E,' on plat exhibit A, to the deposition of F. W. Galbraith. I further find, that as an original proposition, the north boundary line of the 250-acre tract, William Cox to Jacob Pete, September 22, 1814, was the line from 'I to T' on same plat, and in 1833, when said grant was issued, the two tracts adjoined the lines here above described, being the same so far as the latter extended, and being the dividing line of the tracts. I add, that if I am mistaken as to true south boundary of said grant, the result would be the same, because the deed from George M. Combs to William Cox, February 10, 1814, covered both tracts, and both parties to this suit deraign title from William Cox, and I am convinced the north boundary line of the 250-acre tract is the line 'I to T'; that is, if not under said grant certainly under the Combs deed, so far as these parties are concerned, William Cox owned the land in controversy.

"*Second*—I find that somewhere between August 11, 1846, and March 28, 1857, that is, while Presley S. Chesher owned the 250-acre tract, or prior to August 11, 1846, said dividing line was lost, or at least its location became doubtful. As a con-

sequence Chesher, between the point 'I' and the Newmarket road, on said plat, cleared and inclosed the land up to and along the line from 'O to P,' on said plat, being the disputed line, as defendants claim it. Chesher did this under a claim of right, which I infer from the circumstances. He thought that was his line. There is a marked line there, not as old as the line from 'F to E,' but still an old line.

"Further, B. F. McFarland and wife, Sarah M. L. McFarland, a daughter, and the vendee of William Cox, made the same mistake. They either forgot, or never knew, where the true dividing line was, and they clearly recognized the line from 'O to P' as the dividing line between them and Chesher.

"I find no evidence that Mrs. McFarland ever recognized said last named line before her marriage. The deed to her from her father, containing the boundaries of said grant, is dated April 16, 1841, and conveys to her by her maiden name. Her marriage was subsequent, but the date does not appear. On one occasion, while John E. Hopkins owned the 82-acre tract, being the northern portion of the 250 acres, that is, after November 3, 1886, and prior to 1869, when Mrs. McFarland died, she and John E. Hopkins went along the Chesher fence, along the line from 'O to P,' talking about a trade as to Mrs. McFarland's land north of said line, she then recognized said line as the dividing line between her and Hopkins. This is cited as showing the recognition of said line, as defendants

claim it, was not by B. F. McFarland only, but also by his wife.

"This recognition extends as far back as forty years ago, or to 1848. In 1870, the heirs-at-law of Sarah M. L. McFarland, deceased, recognized the same line 'O to P' when they partitioned among themselves the lands inherited from their mother. When John Neal bought the 82-acre tract from B. F. McFarland, November 3, 1863, and when Hopkins bought the same from Neal in 1866, said line 'O to P' was the dividing line, being lived up to and recognized by McFarland and wife; and we may assume that both Hopkins and Neal bought with that understanding, well justified by the conduct of McFarland and wife.

"In 1870, the commissioners making partition did the locating of lines, but that only shows the mistake about the division line had become the understanding of the neighborhood. By accepting the partition the heirs showed themselves ignorant of any mistake, so long had it (the line) been recognized.

"In 1873 John E. Hopkins, desiring to build a new dwelling house, procured the division line to be run by J. P. Galbraith, the husband of one of the McFarland heirs, who showed him where to build. Several other of the McFarland heirs were then at home in the neighborhood, and must have known of the building of the house, which was on their land, as they claim it now, but was on Hopkins' land, and just south of the division line,

as they must have known Hopkins claimed it. To say the least of it, they were silent when they should have spoken.

"In 1877 R. M. Barton, Jr., and wife, Jennie M. Barton, the latter being one of the McFarland heirs, by deed called for the Hopkins division line from 'O to P.'

"In July, 1877, Barton and wife sold the residue of the land partitioned to the latter to William Galbraith, and some time afterward, and prior to June, 1882, when Mr. Galbraith filed his bill against John E. Hopkins, the diccovery was made that the line so long recognized and lived up to on both sides as the true division line, that is the line from 'O to P' was a mistake, and that the true line ran from 'F to E,' or from '3 to J,' on said plat. The line from 'O to P' never was consistent with the second call, 'thence north ten poles to a stake,' or with the fourth call, 'thence north forty-four poles to a stake,' in the deed from McFarland to John Neal, made in 1863. Nor was the same consistent with the calls of the deed from William Cox to Jacob Pete, made September 22, 1814, nor was the same consistent with the oldest marked line on the ground. An accurate survey at any time ought to have discovered the true line. But so it was, the parties on both sides the line made a mutual mistake, without taking the trouble of a survey, on which they acted from some time prior to 1848 to some time after 1877.

"After so long a public acquiescence, and so many

public acts, some by solemn deeds of record on the part of Sarah M. L. McFarland, her husband, and her heirs, under the influence, and with the knowledge of which, strangers have bought the adjoining land and built a valuable house thereon, worth many times the value of land involved, can the McFarland heirs now be heard to complain of said mistake and be allowed to correct the same.

" Where the true locality of the line is doubtful, such acts are regarded as furnishing evidence that the line so recognized is the true line; nor are either of the parties at liberty afterward to abandon such line, although the line should afterward be ascertained at a different place. 9 Yer., 458–9, Green, J. See also 3 Sneed, 446–8.

" In the application of the principle of equitable estoppel there is no exception in the case of married women. Herman on Estoppel, 1232. See also 5 Lea, 405; Pomeroy's Eq. Jur., §§ 814–15–17–18; 1 Head, 320; 8 Bax., 289.

" And the doctrine applies to infants having such intelligence as to enable them to comprehend the import of their conduct. 1 Swan, 438.

" If this authority is doubted still, the only infant affected is Mrs. Barton, who, with her husband, after her majority, ratified her former recognition of the line so long lived up to.

" I do not think the case of *Wm. Galbraith* v. *John E. Hopkins* is *res adjudicata*, because, first, complainants in this cause (except Barton's wife) were not parties to that suit; second, the land in-

volved here was not involved in that suit. The subject-matter was not the same.

"Being clear in my convictions above expressed, without discussing the question of the statute of limitations, I decide, having considered the case as arbitrator, according to the submission made in the case, that complainant's bill be dismissed with costs.

Signed,                    JEROME TEMPLETON."

We have given the entire award, so that it may be seen what were the findings of fact and of law. The award must be taken as a whole, and not in detached sentences. It will not do to cull out words here and there, and from them argue that the parties knew where the true line was. The mutuality of the mistake, and the ease with which the parties might have discovered the same had they taken the old deeds and procured the services of a competent surveyor, does not render it any the less a mistake. The fact still remains that there was an honest ignorance of the whereabouts of the true line, and a *bona fide* recognition of the line indicated on the plat as "O to P."

If, with full knowledge of the true line, another be fixed by verbal agreement, such agreement is within the statute of frauds, and consequently void; but where there is doubt or ignorance as to the true locality of the line, a parol agreement fixing the line between adjoining owners is not within the statute, and where satisfactorily established, will be enforced by the courts, notwithstanding it

may afterward be demonstrated that the agreed line was erroneously fixed; and such adjustment may be shown as well by circumstances and recognition as by direct evidence of a formal agreement, where parties have acted thereon: *Heirs of Houston* v. *Matthews,* 1 Yer., 116; *Gilchrist* v. *McGee,* 9 Yer., 458; *Meriwether* v. *Larman,* 3 Sneed, 451; *Lewellen* v. *Overton,* 9 Hum., 76; *Rogers* v. *White,* 1 Sneed, 69; *Riggs* v. *Parker,* Meigs Rep,, 49; *Yarbrough* v. *Abernathy,* Meigs Rep., 420.

The cases on this subject are numerous in this State, and citations might be multiplied, but they clearly make the distinction and establish the principles as stated above. This being so, it is not difficult to apply them to the findings of fact made by the arbitrator in the case at bar.

We have admissions and declarations; we have conveyances made and partitions had, calling for the line "O to P." We have long acquiescence on the part of complainants, and those under whom they claim, coupled with the expenditure of money by defendant in building improvements upon the property in dispute largely in excess of the value of the land itself, induced not only by what had long been the understanding of the parties as to the location of the line, but by positive pointing out of the line, with knowledge that the improvements were then about to be made. And during all this time we have absolute ignorance on the part of the adjoining owners as to the true line; ignorance none the less absolute by reason of the

fact that, in the opinion of the arbitrator, it might have readily been removed by a survey; there was no survey, and the honest ignorance remained until shortly before the filing of the bill in this cause. This is not a case of silence, but of numerous affirmative acts and admissions that were calculated to, and did influence the conduct of defendants, and which acts and admissions are inconsistent with the claim of title now sought to be set up. The facts, as found, would seem to make out a case of estoppel, unless the disability of coverture prevents the application of this doctrine, as is strenuously insisted upon by the learned counsel for complainants.

Let us see how this is:

The contention is, that as a married woman cannot, in reference to her lands, bind herself by title bond, power of attorney, contract of sale, or even a deed without privy examination, and certificate of acknowledgement in a prescribed form, showing that it was done freely, voluntarily, and understandingly, it would be an anomaly in the law to hold that she might part with her title indirectly when she had no purpose to do so, and when, instead of doing so freely, voluntarily, and understandingly, she was actually in ignorance, or laboring under a mistake of fact. And cases are cited which seem to sustain the contention. It must be admitted that the cases on this subject are, to a certain extent, conflicting. But much of the difficulty and confusion is due to a failure to observe the dis-

tinction between the cases which seek by the doctrine of estoppel to *validate those contracts* of a married woman which, by law, are declared void, and the cases where, in the absence of any contract, and independent of any contract or agreement, her *conduct* has been held to prevent her from asserting what would otherwise be a right. To the former class belongs the case of *Dodd* v. *Benthal*, 4 Heis., 601. And the language of the judge delivering the opinion in that case, at page 607, where he says, "the complainant being both an infant and *feme covert* at the time of the execution of the deed in question, no act of affirmance or disaffirmance *in pais*, on her part during coverture, could be binding on her," etc., is correct when confined to a *contract* of a person under disability, which, by law, is void in consequence of such disability.

To the latter class, above referred to, belongs the case of *Howell* v. *Hale and Wife*, 5 Lea, 405. Here the *conduct* of the married woman, independent of any contract, operates to estop her in the same manner and to the same extent as if she were a *feme sole*. So in the case at bar, while there are facts and circumstances upon which a contract might be implied, that would be binding upon a person *sui juris*, yet there are also such admissions, statements, and conduct on the part of the complainants and their ancestor, as are amply sufficient to create an estoppel entirely independent of and altogether outside of any idea or claim of a contract.

Mr. Pomeroy says: "That while upon the question how far the doctrine of equitable estoppel by conduct applies to married women, there is some conflict among the decisions, the tendency of modern authority, however, is strongly toward the enforcement of the estoppel against married women as against persons *sui juris*, with little or no limitation on account of their disability;" and that the decisions to the contrary seem to be in opposition to the general current of authority. Modern English cases, as well as American, are cited to sustain the text. § 814 and notes.

The case of *Morrison* v. *Wilson*, 73 Am. Dec., 593 (same case, 13 Cal., 494), relied on so confidently by counsel for complainant, seems to not only deny the application of an estoppel *in pais* to a married woman, but goes so far as to hold that affirmative fraud on her part will not effect that result. It is sufficient to say of this case that it not only loses sight of the distinction referred to as to defective execution of *a contract*, but is directly opposed to our own adjudged cases, so far as the element of fraud is concerned.

The doctrine of estoppel has, by courts of this State, been applied to married women and infants. Thus, in *Howell* v. *Hale and Wife*, 5 Lea, 405, she was held estopped by matter *in pais*. She had, by her conduct, induced Thornhill to purchase the mortgage debt on her land, leading him to believe that the land should stand liable therefor; this Court held her estopped by her conduct to make defense

to said mortgage, whether she might have done so or not as against the original mortgagee.

In *Cooley* v. *The State*, 2 Head, 606, we have a clear case of estoppel *in pais* applied to a married woman. She had, in a deposition, made a statement as to title to certain slaves, contrary to what she there asserted in the case before the court; this Court said " complainant would be clearly entitled, upon well established principles, to the relief sought, but for the estoppel created by her oath in the before-mentioned deposition."

To the same effect is *Pilcher* v. *Smith*, 2 Head, 208, where it is said "the legal disability of coverture carries with it no license or privilege to practice fraud or deception on other persons.

Estoppel *in pais* has also been applied to infants by this Court. *Barham* v. *Turbeville*, 1 Swan, 437; *Adams* v. *Fite*, 3 Bax., 69. In the latter case the court, after finding the weight of the proof in favor of the complainant having been of age at time of the execution of the deed, continuing, said, " both on the ground of long acquiescence and of the concealment of the fact that he was not of age, when complainant had good reason to know that Ewing was trading with him as *sui juris*, complainant is repelled, even if he was in fact only twenty years of age when he made the deed."

It is true that in the case of *Barham* v. *Turbeville* the infant was not merely silent, but actively proclaimed his father's title to the property he subsequently sued for, and the court puts the estop-

pel upon the ground of actual and purposed fraud, which was right and proper, under the facts of that case. But so far as the opinion in this case undertakes to hold that *actual* and *positive* fraud at the time of the act set up as constituting the estoppel, is essential to the application of the doctrine of estoppel, it is *obiter* and unsound, as we shall presently undertake to show.

It is also urged that actual fraud must exist before an estoppel can be maintained against a person *sui juris*, and *a fortiori* before it can be applied to a married woman, if against the latter it can be invoked at all.

It is true that there is a theory which makes the essence of equitable estoppel to consist of fraud; but this theory is not sustained by principle or authority. There are many well settled cases of estoppel familiar to courts of equity which do not rest upon fraud, and instances are admitted, even by the courts which maintain this theory, which cannot be said to involve any element of fraud unless by a complete perversion of language and misuse of terms.

The confusion to be found in some of the books on this subject is due doubtless to the fact that the fraud referred to has its origin in the effort afterward to set up rights contrary to the conduct of the party, although at the time of the act constituting the estoppel there was the most perfect good faith. The term, as used in such cases, is, as Mr. Pomeroy expresses it, virtually synonymous

with "unconscientious" or "inequitable." It is in this sense that it may be said that it is a fraud, or fraudulent to attempt to repudiate the conduct which has induced the other party to act, and upon which the estoppel is predicated; but it is entirely another thing to say that the conduct itself—the acts, words, or silence of the party—constituting the estoppel, must be an actual fraud, done with the then intention of deceiving.

It may, therefore, be safely said that although fraud may be, and often is, an ingredient in the conduct of the party estopped, it is not an essential element if the word is used in its commonly accepted sense; and the use of the term is unnecessary, and often improper, unless applied to the effort of the party estopped to repudiate his conduct, and to assert a right or claim in contravention thereof.

The best considered cases are in accord with the views above expressed. *Continental Bank* v. *Bank of the Commonwealth*, 50 N. Y., 575; *Waring* v. *Somborn*, 82 N. Y., 604. And although the earlier Pennsylvania decisions generally leaned strongly in favor of the theory that an actual fraud is of the essence of every such estoppel by conduct, it is worthy of note that in the late case in that State of *Bidwell* v. *Pittsburg*, 85 Pa. St., 412, it is said: "It is not necessary that the party against whom an estoppel is alleged should have intended to deceive; it is sufficient if he intended that his conduct should induce another to act upon it, and the

other, relying on it, did so act.   2 Pom. Eq. Jur., §§ 804, 805, et seq.

The case of *Brant* v. *Virginia Coal Co.*, 93 U. S., 326, pressed upon us by counsel for complainant, as establishing the contention that fraud is an essential element in the application of the doctrine of estoppel, and that it is essential that the party invoking the estoppel was himself not only destitute of the knowledge of the true state of the title, but also of any convenient or available means of acquiring such knowledge, merits special mention.

In addition to what we have already said as to the first proposition, we will be content to adopt Mr. Pomeroy's note upon this case, where, after quoting freely of the opinion, he says: " With great deference to the opinion of so able a judge, I think his error in this passage is evident.   It consists in taking a special rule, established from motives of policy for a particular condition of fact, and raising it to the position of a universal rule. Where an estoppel by conduct is alleged to prevent a legal owner of land from asserting his legal title, courts of equity, in order to avoid the literal requirements of the statute of frauds, were driven to the element of fraud in the conduct as essential.   (See the text, §§ 805–807).   The passage quoted from Judge Story is dealing with this long settled rule of equity, and not with the subject of equitable estoppel in general.   When this special rule is made universal its inconsistency with many familiar instances of equitable estoppel becomes ap-

parent, and Judge Field is forced to escape from the antagonism by denying that these instances do in fact belong to the doctrine. If this conclusion be correct, then some of the most important and well settled species of the estoppel, uniformly regarded as such by text writers and courts, must be abandoned, and the beneficent doctrine itself must be curtailed in its operation to one particular class of cases. This result is in direct opposition to the tendency of judicial decisions and of the discussions of text writers." See note 1 to § 806 of Pomeroy Eq. Jur., and cases there cited.

It is worthy of notice also, that in the opinion referred to Judge Field quotes approvingly from the Pennsylvania case of *Hill* v. *Epley* (31 Penn. St., 334), language which is practically, to all intents, an abandonment of the extreme position supposed to be maintained in the *Brant* case. The language referred to is: "The primary ground of the doctrine is, that it *would be* a fraud in a party to *assert* what his previous conduct had denied, when on the faith of that denial others have acted. The element of fraud is essential *either* in the *intention* of the party estopped, or in *the effect of the evidence* which he attempts to set up." So that at last the difficulty seems to be in the use of terms rather than in the true principles controlling the doctrine under consideration.

As to the second proposition, for which the *Brant* case is cited, it is sufficient to say that it does not sustain the position that the mutuality of the

mistake, or the possibility of having discovered it, prevents the application of the doctrine of .estoppel. It merely asserts the familiar rule that where the party setting up the estoppel knew the true condition of the title, either in fact or in contemplation of law, the doctrine will not avail him. The fact being in that case, as shown in the opinion, that "he knew he was obtaining only a life estate by his purchase."

This opinion is already too long to allow further elaboration on the question of estoppel under the facts of this case. It will, however, not be out of place to add, that I find nothing in the numerous reported cases in this State, from *Patton* v. *McCluver*, Mar. & Yer., 339, down to *Allen* v. *Westbrook*, 16 Lea, 251, that makes willful fraud on the part of the party sought to be estopped in the act constituting the grounds of the estoppel essential to the application of the doctrine. We. hold, therefore, that there is, in the case at bar, on the facts as found by the arbitrator, every element of an equitable estoppel, and complainants must be repelled. The disability of coverture is not sufficient to defeat this result.

Let the decree of the Chancellor be affirmed, with costs.