MARY A. CAMPBELL *et al. v.* J. S. BARTLETT *et al.*

(*Knoxville.*   September Term, 1909.)

1. **SPECIFIC PERFORMANCE.** Of title bond contract must be
   sued for with reasonable promptness.

A bill for specific performance of a contract of sale of land evi-
denced by a title bond must be brought with reasonable prompt-
ness, even where the writing does not in terms make time of the
essence of the contract, especially where there has been a
great increase in the value of the property, and the purchase
price has not been paid.  (*Post, p.* 214.)

Case cited and approved: Smith v. Christmas, 7 Yerg., 565.

2. **SAME.** Same.  Coverture or infancy is no excuse for unrea-
   sonable delay to perform contract and sue for specific perform-
   ance.

In a suit for the specific performance of a contract of the sale
of land evidenced by a title bond, the rule, requiring the infant
heirs of the deceased purchaser to perform their ancestor's con-
tract by the payment of the purchase money, with reasonable
promptness, to entitle them to relief, applies to a married wom-
an as well as an infant, and her disability, like that of an infant,
is not an excuse for unreasonable delay in making payment;
and after a great lapse of time, and a large increase in the
value of the property, a married woman, notwithstanding her
disability, will not be awarded specific performance of a con-
tract of the sale of land evidenced by a title bond in favor of
her father, on which the purchase money was long past due
when he died, especially where she seeks specific performance
as to only an undivided one-eighth interest in the land as the
share inherited by her, forty-two years after the death of
her father and twenty-six years after the surrender of the
title bond and the abandonment of the property by the other
heirs.

Campbell v. Bartlett.

Cases cited and approved: Smith v. Christmas, 7 Yerg., 565; Mann
  v. Dun, 2 Ohio St., 187; Brown v. Haines, 12 Ohio, 1; Henry
  v. Conn, 12 Ohio, 193; Scott v. Barber, 14 Ohio, 547; Benedict
  v. Lynch, 1 Johns. Chy., 370.

Cases cited and distinguished: Dodd v. Benthal, 4 Heisk., 601;
  Moore v. Walker, 3 Lea, 656.

Numerous Tennessee cases upon the subject of estoppel of mar-
  ried women are cited in the opinion, on pages 213, 214.

### FROM CAMPBELL.

Appeal from the Chancery Court of Campbell County.
HUGH G. KYLE, Chancellor.

JAMES M. HILL, JOHN P. ROGERS, and AGEE & PETERS,
for complainants.

W. A. OWENS and JOUROLMON, WELCKER & SMITH,
for defendants.

MR. JUSTICE NEIL delivered the opinion of the Court.

The bill in the present case was filed to recover
a one-eighth undivided interest in a tract of land
described.    This land was sold, or the greater part
of it in 1853, to James S. Murray, complainant's
father, by a title bond executed by one J. M. Coop-
er.    In 1861, fifty acres additional were added, and

122 Tenn—14

the old title bond taken up and a new one executed, putting both tracts into one. In December, 1864, Murray died, without having paid the purchase money for either tract. His children all married and moved away, except F. M. Murray. He remained upon the land with his mother until about the year 1871, when, becoming convinced that they could never pay the balance of purchase money due, which, with interest, was then more than the original sum, they surrendered the bond, and the possession of the land, to the vendor, Cooper. He placed a tenant in possession, one Reuben Marlow, who remained until about 1880. P. W. Rutherford then went upon the land, and remained until the summer of 1881. After this F. M. Murray was upon the land for a while, but it does not clearly appear how long he remained. Perhaps others of the heirs at law of James S. Murray were upon parts of the land for a year or two at a time, but none of them attempted a permanent residence. In 1886 several of the heirs of the vendor, Cooper, who had died in 1880, conveyed their interest in the land now in controversy, along with many hundred other acres besides, to F. M. Murray, and in 1886 others of these heirs conveyed to him, so that, when these deeds were made, he was the ostensible owner of seven-eighths interest in six hundred or seven hundred acres of land, including the three hundred acres now in controversy. On May 2, 1890, F. M. Murray conveyed his seven-eighths interest in the lands thus acquired to William Baird, S. C. Baird, and Jeremiah Smith. On

March 25, 1902, these persons conveyed the same interest to Benjamin D. Bartlett.  On April 3, 1902, William Baird acquired the remaining one-eighth interest from the heirs of the persons representing that outstanding interest in the Cooper estate, and on January 8, 1903, he conveyed it to Benjamin D. Bartlett.  On April 1, 1905, Benjamin D. Bartlett conveyed all of the lands to J. S. Bartlett, and in the same year the latter conveyed an undivided one-third interest to H. M. La Follette, and a portion was also conveyed by him to the La Follette Coal, Iron & Railroad Company.

On July 7, 1906, the complainant, joined by her husband, Wyatt F. Campbell, filed the present bill against the said J. S. Bartlett, H. M. La Follette, and the La Follette Coal, Iron & Railroad Company, in which she asserted her right to a one-eighth undivided equitable interest as heir at law of James S. Murray, deceased, in the land covered by the title bond made to her father in 1861, on the ground that she had never consented to the surrender of that bond, expressing a willingness to pay out of her share any of the purchase money remaining unpaid.  *She learned about the year 1880, or shortly* thereafter, that the title bond had been surrendered. She made no complaint until 1890, when she told her brother, F. M. Murray, that she still claimed her one-eighth interest.  She also made the same statement, in substance, to William Baird, about the time he was negotiating his purchase of the land.  In 1890 she employed an attorney to bring suit; but he was the son-in-

law of F. M. Murray, and after a conference with the latter he declined the employment. After this she slept upon her rights until the present bill was filed, sixteen years later, or twenty-six years after the surrender of the title bond, and forty-two years after her father's death. She has, however, all the time been under coverture.

The present defendants had no actual knowledge of complainant's claim when they purchased and obtained deeds in fee to the lands; but there was, perhaps, sufficient reference to a title bond or bonds, in the deeds made by the Cooper heirs to F. M. Murray, which were in their chain of title, to start them upon an inquiry which would have led to a discovery of the existence of the title bond of 1861, and of the fact that complainant had no hand in surrendering that bond, and that she was still claiming an interest in the land; that is, if we can assume that the parties indicated, the Coopers and F. M. Murray, were willing to make true replies to inquiries, and would have done so. The title bond was not registered; but it seems to have been handed, with the unpaid notes, as papers no longer useful, to F. M. Murray, by the Coopers, when they made the deeds to him, and the bond was by him handed over to William Baird, along with the deed made to him and his co-purchasers. The Cooper deeds did not describe any special title bond, but stated in general terms that title bonds had been executed on the lands and never paid for, and that they did not warrant against such incumbrances.

Campbell v. Bartlett.

When the title bond was executed the land was worth only $1 an acre, because of little value for agricultural purposes and unavailable for mineral uses, being in a mountainous country, remote from railroads.  Within recent years a railroad has been built into that country, and coal discovered upon the land, close to transporta· tion facilities.  As a consequence, the land is now worth $50 per acre, an increase in value of fifty-fold.

In disposing of the case, we shall assume, without deciding, that the facts stated were sufficient to fix the defendants with constructive notice, under our registration laws     (*Teague* v. *Sowder,* 121 Tenn., 132, 114 S. W., 484), though it is worthy of remark that after such a great length of time as had ensued when Bartlett bought he might perhaps assume that any outstanding title bonds, not already enforced, had been abandoned, and, in that event, his defense of innocent purchaser would be available.  We shall not consider the general subject of estoppels against married women arising out of conduct on their part deceiving and misleading persons relying thereon, upon different phases' of which we have cases.  *Galbraith* v. *Lunsford,* 87 Tenn., 89, 9 S. W., 365, 1 L. R. A., 522; *Pilcher* v. *Smith,* 2 Head, 208; *Cooley* v. *Steele,* Id., 605; *Fletcher* v. *Coleman,* Id., 384; *Stephenson* v. *Walker,* 8 Baxt., 289; *Howell* v. *Hale,* 5 Lea, 405; *Berrigan* v. *Fleming,* 2 Lea, 271; *Fogg* v. *Yeatman,* 6 Lea, 580; *Anderson* v. *Akard,* 15 Lea, 192; *Gates* v. *Card,* 93 Tenn., 341, 24 S. W., 486; *Johnson City* v. *Wolfe,* 103 Tenn., 277, 52 S. W., 991;

*Bruce* v. *Goodbar,* 104 Tenn., 638, 645, 58 S. W., 282. And see *Duckwall* v. *Kisner,* 136 Ind., 99, 101, 35 N. E., 697; *Catherwood* v. *Watson,* 65 Ind., 576; *Minnich* v. *Shaffer,* 135 Ind., 634, 34 N. E., 987.

We are of the opinion, however, that the controversy must be decided adversely to complainant, on the ground that the present bill is in effect one to enforce a specific performance of the contract of sale evidenced by the title bond. Such rights must be enforced with reasonable promptness, even where the writing does not in terms make time of the essence of the contract, especially when there has been a great increase in the value of the property. *Smith's Heirs* v. *Christmas,* 7 Yerg., 565. In that case eight months was held too long a delay, although the complainants were infants, who had succeeded to the rights of their father, who had died before the maturity of the contract. The uncle of the infants assumed to act in their behalf after the death of their father. He testified that on the 1st day of January, the time when the purchase money was due, under the contract, he did not consider it an advantageous contract. It seems to have been thought better then to lie by and speculate on the advantages of the contract. The property might rise, or it might fall, in value, or remain stationary. In either of the latter two events, the friends of the infants did not intend to execute the contract. The court said they could not, after waiting eight months and willfully neglecting to do anything, and by their backwardness authorizing the inference

Campbell v. Bartlett.

that they did not intend to do anything, and after the property had increased threefold, come into a court of equity and get the contract enforced. "It would be most inequitable if they could," continued the court, "and it is not believed that, in any case circumstanced as this is, has a court of equity ever decreed in favor of a complainant. It is true that the simple fact of a rise in the value of the property is not a ground for refusing a specific performance. 2 Ver., 42, 43, 280. Nor do we consider that, in a contract like this, where there is no condition that it shall be void on the nonperformance of one of the parties, time is of the essence of the contract; but time in such a case is material, and if there be no excuse for nonperformance, according to the stipulation of the bargain, and the party has willfully lain by, until the circumstances of the estate have changed and a performance would be ruinous to the other party, a specific performance will not be decreed. In this case Christmas gave up an advantageous contract with Camp, which he had made on the faith of this. Lands in that section of the county had greatly increased in value before an offer was made in behalf of the complainants to perform this contract, during all which time their friends had willfully forborne to do anything in the business. They came now too late to obtain the assistance of this court."

In another opinion in the same case the English doctrine was stated to be: "When a court of equity holds that time is not of the essence of the contract, it pro-

ceeds upon the principle that, having regard to the nature of the subject, time is immaterial to the value, and is urged only by way of pretense and evasion. *Dolorch* v. *Rothschild,* 1 Sim. & Stuart, 590.  Where the contract upon its face is to be void in case of default, there the defendant may so consider it, though, if he waive the default, the circumstances remaining the same, he will be bound by the contract.  Where there is any change in the circumstances, either of the estate or the parties, as the falling in of lives, or any great rise or fall in value, a specific performance will not be decreed.  Where the delay has operated injuriously to the defendant, or where his object in making the contract has thereby been defeated, a performance will be refused.  *Crofton* v. *Ormsby,* 2 Sch. & Lef., 604.  Where the party has lain by and speculated, or has trifled and shown a backwardness in carrying the contract into effect, no decree will be made in his favor. 12 Ves., 228; *Guest* v. *Humphrey,* 5 Ves., 818.  See, also, Sugden on Vend., 277, 278, 281; Jeremy, 461, 462."  Speaking further to the same matter the court said:  "If this be the state of the English law, what ought to be the rule in this country?  In England land is of a permanent and fixed value.  There is but very little fluctation in price, so that what is a fair valuation in one time is generally so a year or two afterwards.  This rule, then, that time is not of the essence of the contract, restricted as it is by the modern doctrines of the court, may have pretty extensive application in practice in that country, consistently with the

substantial rights of the parties. But as often as the application of the rule would not subserve the ends of justice, the courts have departed from this rule and refused to enforce the contract. In this country, which is comparatively but newly settled, where the price of land depends upon the tide of emigration, the settling and improving of particular sections, the springing up of towns, and other causes operating to change the price in particular neighborhoods, as well as larger sections, the rule, restricted as it should be, would be found of much less practical utility. In this country, time should be regarded as a circumstance of decisive importance, fixing the necessity upon the negligent party of observing that the defendant has waived the default, or that no inconvenience or loss will arise to him, and that the property is substantially of the same value. This is the view taken of the subject by Chancellor Kent in *Benedict* v. *Lynch,* 1 Johns. Ch. (N. Y.), 379, 7 Am. Dec., 484, with whose general course of reasoning in that case I entirely concur."

Upon the subject of the infancy of the complainants, the court said: "But it is said that laches cannot be imputable to these complainants, because they are infants. Upon this part of the case we cannot better express the views we entertain than in the language of the chancellor. 'It is true,' he says, 'in many cases this answer to the objection of time elapsed would be good for some reasonable delay on the part of the infants. In all cases, depending on the question of abandonment

simply, or backwardness and trifling conduct, they would be considered as standing on more favorable grounds than adults. But I cannot assent to the position that this is to be allowed as an excuse, when the fault or delay, from whatever cause it may have arisen, other than the acts of the defendant, has been the means of defeating the object of the defendant, or where the property has greatly risen or fallen in value in the meantime.˙ If we adopt such a rule, while we relieve one party from an inconvenience, we do great injustice to the other. In cases of this kind a court of equity will leave the parties to their legal remedies, and will let the loss fall where Providence has placed it. This view of the question is supported and enforced by that able Chancellor Lord Reddesdale, in the case of *Griffin* v. *Griffin*, 1 Sch. & Lef., 352. Infants, in such cases, must always act by their friends, and their rights will be saved or lost by the activity or negligence of those whom nature has placed around them for their protection. If this should not be the case, the infants would be protected until maturity, which might be for twenty years or more, and, in the meantime, both parties to the contract might be dead, and the situation of the parties interested, and the value and circumstances of the property, entirely changed.' If the infancy of the complainants be an excuse for a delay of eight months, it may, for the same reason, excuse a delay of twenty years. The injustice such a rule would inflict the other party could not be endured. But in this case the friends of

Campbell v. Bartlett.

these infants were alive to their interests. They forebore to do anything so long only as they believed it would be for the benefit of the infants to forbear; but when they find, by the sudden rise of property, that it would be for their interest to act, we find them promptly doing all they could to secure the speculation. As the notes were at last executed and tendered by the administrators, they could have been as easily executed and tendered by them at any previous time, so that there is no pretense for an excuse for the delay growing out of the infancy of the complainants. Had Smith's death, just before the time the contract was to be completed, been attended with any embarrassment or difficulty, so that the friends of the children knew not how to act, or were unable to act in the business, and if so soon as they reasonably could have done so, advice had been taken, and an offer made to perform the agreement on their part, this would have been a good excuse for delay; and although the lands might have risen in value, still the contract would have been enforced. But this was not the case. The administrator, whose duty it *was to act, was appointed at the October court.* He was acquainted with the nature of the contract, and knew that it devolved on him to perform it on the part of Smith; but, not believing it an advantageous one on the part of Smith's children, he purposely declined doing anything until the great rise in the value of the land convinced him that it would be greatly to their advantage to have the bargain executed, and then he was will-

ing to put himself to great personal inconvenience to secure it for them. If, after all this, the infancy of these complainants should be held sufficient to excuse this delay, under the circumstances of this case, the friends of other infants will have the strongest temptation to commit the most deliberate frauds upon persons with whom the ancestors of such infants may contract. They may purposely hold back for years, until some favorable change in the estate shall occur, and then come forward and offer to perform, and plead the infancy of the children as an excuse for the delay." See, also, on the general subject, *Mann* v. *Dun,* 2 Ohio St., 187; *Brown* v. *Haines,* 12 Ohio, 1; *Henry* v. *Conn,* Id., 193; *Scott's Ex'rs* v. *Barber's Heirs,* 14 Ohio, 547. See, also, *Benedict* v. *Lynch,* 1 Johns. Ch., 370, 7 Am. Dec., 484, 1 L. Ed. N. Y. Ch. Rep., 175, and note. In *Henry* v. *Conn,* the court held that, where the purchase money becomes due in the lifetime of the vendee, the infancy of his heir will not excuse delay in making payment, so as to induce the court to decree performance against the vendor, after a great lapse of time. This rule was approved and followed in the subsequent case of *Scott's Ex'rs* v. *Barber's Heirs,* supra.

In the case we have before us, the purchase money had long been due when the father of complainant died. In this class of cases, at least, we think the same rule should apply to a married woman as to an infant, to say nothing of the more stringent rule laid down in *Smith's Heirs* v. *Christmas,* supra. We are, however, further

of opinion that after a great lapse of time, and a large increase in the value of the property, the rule of *Smith's Heirs* v. *Christmas* is a proper one to be applied, even to married women. Certainly the natural inhibition upon infants, arising out of their immaturity, is no less than the supposed restraint of coverture in cases of married women, preventing them from setting up claims to valuable property. The underlying reason in each instance is the public policy that supports the rule.

The present decision is confined to cases wherein specific performance is sought. We do not impair the authority of *Dodd* v. *Benthal*, 4 Heisk., 601, and *Moore* v. *Walker*, 3 Lea, 656, and similar cases wherein a married woman seeks to set aside deeds made by her, or to recover property the title to which has been vested in her.

On the grounds stated, we are of the opinion that the decree of the chancellor dismissing the bill should be affirmed.

The chief justice, while concurring, is of the opinion that the court should go further, and authoritatively determine that, after such a lapse of time, one examining the records in the register's office, and seeing such a statement concerning title bonds as appears in the deeds referred to, would have the right to presume conclusively that such title bonds had been abandoned, and were hence no longer in the way of his making a purchase. In brief, he is of the opinion that after such a length of time, recitals of the character above referred to would not put the purchaser upon inquiry.