## HIGH GRAVITY OIL CO. v. SOUTHWESTERN PETROLEUM CO. et al. HUDSON et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. March 6, 1923.)

Nos. 3686, 3687.

1. **Boundaries ⬤═46(3)—Rule as to agreement as to boundary held to apply to oil lands.**

The rule that adjoining owners, where the dividing line is uncertain or disputed, may orally agree that a particular surveyor may fix the line, and that, if he does so, and they thereafter execute the agreement, by either marking the new line or by taking possession up to it, such line becomes the true boundary, *held* operative to fix the dividing line between lands valuable for oil alone, where one set of owners employed a surveyor to fix their east line, and another set employed him to locate their west line, although it was not clear whether the employment was joint, and he determined a line, and furnished a copy of a map showing it to both sets of owners, and both parties located their oil wells on their own side of such line; this constituting an execution of the agreement, which execution was appropriate to the character of the land.

2. **Boundaries ⬤═48(2)—Facts held to show acquiescence in boundary.**

Where plaintiff oil company, lessee of the east half of a tract, when a surveyor located a line as the eastern boundary of the tract and the western boundary of defendant's tract, recognized such line by adjusting and fixing according to it the line between such east half and the west half of the tract leased to another, plaintiff was charged with notice that defendant would treat its conduct as acceptance of the surveyor's line, and where both parties thereafter treated the line as the basis of subsequent expenditures and improvements by each, such as drilling oil wells, such line became the true division line.

3. **Compromise and settlement ⬤═6(3)—Avoiding litigation good consideration.**

The actual ending of a controversy and avoiding of the threatened litigation is always a sufficient consideration for a settlement agreement, even if one side conceded the whole matter in dispute.

4. **Frauds, statute of ⬤═129(4)—Taking possession of land satisfies statute.**

Where surveyor located the line between two oil tracts, and defendant took possession of the strip in dispute, which was given defendant by such line, and drilled wells thereon, the statute of frauds was satisfied; the land having been taken possession of in appropriate form.

5. **Boundaries ⬤═32—Agreed location of boundary line need not be alleged in answer.**

There is no rule of pleading in the federal courts of equity requiring the defense of agreed location of a disputed line to be alleged in the answer; such fact constituting only evidence interpreting the title papers.

6. **Boundaries ⬤═46(3)—Agreed location of line a good defense in equity.**

Even if the effect of defense of agreed location of a disputed line depends on principles of estoppel, and under some circumstances might not escape the statute of frauds, as to legal title, a court of equity will not, in disregard of such an agreement, award relief as between lessees of oil lands, in suit for injunction and accounting, and to establish title.

Appeals from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suits in equity by the High Gravity Oil Company and by Frank Hudson and another against the Southwestern Petroleum Company and others. From decrees for defendants in both suits, plaintiffs appeal. Affirmed.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Lawrence Maxwell, of Cincinnati, Ohio, and Ed. C. O'Rear, of Frankfort, Ky. (O'Rear, Fowler & Wallace, of Frankfort, Ky., E. L. McDonald, of Lexington, Ky., and Martin T. Kelly, of Frankfort, Ky., on the brief), for appellants.

Robert H. Winn, of Mt. Sterling, Ky., and LeWright Browning, of Maysville, Ky. (Worthington, Browning & Reed, of Maysville, Ky., and John A. Judy, of Mt. Sterling, Ky., on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. These are appeals from decrees in favor of the defendants in two suits brought by the appellants, referring to adjacent parcels of real estate, the purpose of which suits was to enjoin the further extraction of oil by defendants, to procure an accounting for what had been taken, and to establish plaintiffs' title. Prior to 1888 David Pryse had the legal title to all the land in controversy. In that year he made a deed to Simpson Crabtree. The easterly line of what he conveyed, being the westerly line of what he kept, and along that portion now in dispute, was described as "thence with the cliff" in a generally northeasterly direction, by stated courses and distances. As is common, some of the courses and distances as recited turn out to be impossible of acceptance, and the location of the line depends upon the interpretation of the phrase "with the cliff."

In the general locality of this line there was a sharp ridge running northerly, with a bend toward the east. Along this ridge for the greater part of its course there is a sheer cliff facing easterly, and another one facing westerly. At places they are not more than 100 feet from each other; at other places they are further apart; and the ridge carries similarly cliff-faced spurs on both east and west. The summit of the ridge lies approximately midway between the faces. Upon its westerly face, toward Crabtree, the lower cliff, while sheer in places, in other places is broken or sloping, and above it with more or less interruption are second and third upstanding ridges of rock, which might or might not be considered part of the cliff face. As soon as the Pryse-Crabtree deed is read and the reader is informed as to the general topography, the description becomes sharply ambiguous. "With the cliff" may mean with the summit of the cliff ridge, or it may mean with the westerly face of the cliff, and, if it has the latter general meaning, then whether it runs with the bottom of the first cliff, with its top, or with the upper ridges of rock, and where it goes in the places where the cliffs are broken, and whether it goes around or across the westerly spur from the ridge, all are uncertain.

Until recently the narrow strip of land between the two lines—the center and the edge, containing only a few acres in total area—was of no practical value, except for a small amount of timber. There is testimony tending to show that claimants under Pryse cut timber from the east over to the edge of the cliff, and this with Crabtree's acquiescence, and that claimants under Crabtree cut timber from the west up to the center line with the acquiescence of Pryse's grantees; but with the discovery of oil the strip became valuable, and this litigation has resulted.

The Southwestern and Cliff Companies, the defendants, were lessees, claiming under Pryse's grantees by leases which were said to carry their rights westerly to the top edge of the bottom or main cliff, and running the whole length of the cliff line in question. Crabtree had divided his land west of the cliff ridge, giving the northern part to one daughter and the southern part to another. Whether the deeds of conveyance to them are bounded on the east by the cliff face, or by the center of the ridge line, is wholly impossible to tell from the papers, or without knowledge outside of the record as to stated monuments, and perhaps it would not be possible even then. Thereafter plaintiffs Hudson and Collins acquired a lease of the southern part from one daughter, and plaintiff High Gravity Oil Company and another corporation, the Swiss Oil Company, acquired from the other daughter a joint lease of the northern part. In each lease the territory covered was described in the same unintelligible way (as to its eastern boundary) as in the deeds from Crabtree to his daughters.

Hudson and Collins and the High Gravity Company drilled wells upon their properties west of the cliffs, but took no possession of anything on top of the cliffs. Later the Southwestern and Cliff companies drilled wells upon the disputed strip itself on top of the cliff, and this was the situation when these suits were brought.

The question to which attention was chiefly given below, and which was first argued in this court, was as to the rightful location of the cliff line contemplated by the Pryse-Crabtree deed. Plaintiffs' contention that it should be located along the top of the ridge was based largely upon the claim that it was in fact so run and marked by the surveyor at the time, with the further contention that the stated courses and distances in the deed, when modified and corrected according to established Kentucky rules, do accommodate themselves substantially to the summit line of the cliff ridge, but cannot be applied even approximately to the cliff face line. The defendants contended, not only that the deed unambiguously called for the face of the cliff, but that, if there was ambiguity, it was upon the facts to be solved on that theory. The District Judge considered this question only, and held with the defendants upon its merits. Our examination of the record has induced substantial doubt whether this conclusion was correct;[1] but,

---

[1] As indicative of the difficulties involved, we note that one of the strongest arguments in the court below, and here, supporting the defendants' interpretation of the deed, was that a certain plat, said to have accompanied this survey and having its courses and distances specified in the attached surveyor's notes (in some cases inconsistently with the plat), tended to establish defendants' theory, in that, if the lines were located according to this plat the survey would close, while, if the portion of the line here in controversy, being the southeasterly boundary of the tract, were located where plaintiffs put it, the survey would not close. This conclusion overlooks the fact that, according to the final theory of survey upon which this plat was made, the northeastern and the northwestern lines of the tract were ideal, and were merely prolonged until they met. The survey could not help closing, and it would close just as well, no matter where the southeastern side was. As the survey was actually made, the southeastern side was made to run by many meanders northeasterly along this cliff line (face or top, as may be thought). Reaching its end

without undertaking to reach a decision upon that subject, we observed that the record also tended to show another sufficient defense. Accordingly we asked for further briefs from counsel thereon, and such briefs from both sides have now been filed.

[1] It is a well-established rule in Kentucky that where there is a dispute, or even uncertainty, as to the dividing line between adjoining owners, and they orally agree that a particular surveyor may fix the line, and he does so, and they thereafter execute the agreement, either by marking the new line, or by taking possession up to such line, the line so fixed, called sometimes in Kentucky a "conditional line," becomes the true boundary. Garvin v. Threlkeld, 173 Ky. 262, 266, 268, 190 S. W. 1092; Wisconsin Steel Co. v. Lewis, 178 Ky. 765, 768, 199 S. W. 1068; Turner v. Bowens, 180 Ky. 755, 758, 203 S. W. 749. If Amburgy v. Burt, 121 Ky. 580, 89 S. W. 680, is to be taken as requiring mutual concessions, it is inconsistent with the later cases. These three conditions—dispute, agreement, execution—just recited do not all exist in these instant cases in the ordinary conventional form, but we think they are here in substance, and govern the result.

It is not to be doubted that there was a long-standing controversy as to the true location of this cliff line. The dispute had appeared and reappeared, as between the grantors of the present parties, and, indeed, it was inherent in the Pryse-Crabtree deed. About the latter part of 1917, the parties to these suits had acquired interests by oil leases, as above stated. These oil leases themselves, or the next instrument back in the chain of title, or both, were hopelessly vague, and in some respects plainly erroneous as to the location of this dividing line. At that time Hudson and Collins employed a surveyor, Rowe, to locate their east line, and at about the same time defendants employed him to locate their west line. It is not clear whether the employment was joint. Rowe examined the deeds in the chain of title, acquired such other information as he could, made up his mind that the top edge of the lower or main cliff face was the true line, and made a careful survey and map of it accordingly. A copy of this map was furnished to defendants, and one to Hudson and Collins. We

at the eastern corner of the tract, the northeastern side line was then run in a stated course until it intersected the named stream, and it was run and measured along that course to that point. The southwestern side was likewise meandered along a cliff ridge, and from its northwesterly end the northwesterly side line was run, on a stated course, to this same stream intersection, being the northerly point of the tract, and this northwesterly side line was likewise run and measured. Then the surveyor must have made a tentative plat, because the testimony is that he found his included area was about 100 acres more than the acreage agreed to be conveyed. He removed this excess by swinging his northeasterly and northwesterly lines toward each other on their fixed southern ends, thus carrying the northerly point of the tract quite a distance further south and leaving its location merely ideal. These corrected lines were never run or measured on the ground. Their length, as stated in the surveyor's notes and the deed, must have been obtained merely by computation from the plat.

thus find, in substance, although not in technical form, that both par-ties employ a surveyor to locate a disputed line, and that he does so.

There was no marking of this line on the ground, probably because it was merely the adoption of an existing monument. Neither was there any such taking possession up to the new line, and acquiescence there-in by both parties, as would appear in the case of ordinary cultivated land. However, this land was of no substantial value, except for the drilling and maintaining of oil wells, and full possession for this use must be the equivalent of possession by cultivation of land capable of that use. Some time after this survey, Hudson and Collins began to drill the first well of either party along this line. They located it immedi-ately under the cliff. The defendants thought they should keep further away, and some discussion led to a further agreement that Rowe should locate the wells for both parties. He did so, and marked them on the map, locating the wells of each party 200 feet back from the boundary line as shown on his map (excepting for offsetting equaliza-tions of what had already been done). This agreement to drill accord-ing to the Rowe locations was not fully carried out; but, for what they thought sufficient reasons, defendants drilled some, at least, of their wells as near to the top cliff edge as possible, and some, at least, of Hudson and Collins' wells were correspondingly close to the bottom of the cliff. This conduct on both sides was not in execution of the agreement for the Rowe well locations, but it was in recognition of and in execution of the Rowe location of the dividing line. Hudson and Collins never undertook to drive a well east of the cliff face, nor did they, so far as the record shows, ever protest or object to the driv-ing of wells by defendants on the now-disputed strip, on the ground that such wells were upon Hudson and Collins' land, but only because they came too near to that land. We must consider the driving of such wells by the defendants upon the overlap, and Hudson and Collins' conduct in keeping clear from it, and locating all their wells with refer-ence to the new conditional line, as constituting that execution of an agreement for a conditional line which is appropriate to these circum-stances. It follows that the line located by Rowe became the true division line, and that Hudson and Collins must fail.

[2-4] The corresponding result is reasonably clear as to the north-ern part of the line, upon which the High Gravity Oil Company abuts. Upon this northern part of the Crabtree property, the High Gravity Oil Company had become lessee of the eastern half and the Quaker Oil Company of the western half; but the dividing line between them had not been run. For this purpose Surveyor Rowe was appointed by the Quaker Company and Surveyor Westcott for the High Gravity Company. In order to find the center, it was necessary to locate the eastern boundary, which is the line now in controversy. Surveyor Rowe "at about the same time" was locating this same line in the em-ployment of the present defendant, and made, or had made, his map locating the line at the edge of the cliff. In connection with locat-ing this center line, Rowe insisted that the cliff edge should be the eastern line, while Westcott insisted that it should be the middle of the cliff ridge. Westcott yielded, and the cliff edge line was agreed

upon. The necessary effect was that the resulting deficiency in the tract, as compared with its total if it had extended to the ridge summit, was divided between them, and the dividing line between them was adjusted and fixed accordingly. It must be conceded that defendant was not a party to this agreement and so cannot directly claim under it; but this division agreement was so far connected with the locating of defendant's western and northern line by Rowe that defendant may well be charged with notice of the division agreement and the High Gravity Company be charged with knowledge that the defendant would treat such conduct as an acceptance by the High Gravity Company of the Rowe boundary line. The defendant's subsequent action in drilling its wells upon this strip may be considered based upon its knowledge that Rowe had fixed the line and that the High Gravity Company had accepted the line so fixed, even though there were no direct contract relations between them. There was the fixing of the line by the one; an express adoption by the other, for its own purposes, of the line so fixed; knowledge by the one of this adoption, and thereafter tacit acceptance and acquiescence by both, of the line as the basis of subsequent expenditures and improvements by each.

The actual ending of the controversy and avoiding of threatened litigation is always a sufficient consideration for a settlement agreement, even if one side concedes the whole matter in dispute; and taking possession of land in appropriate form avoids the statute of frauds. We think the situation here developed satisfies the spirit of the Kentucky rule, as well as makes a good defensive case in equity. Four or more wells were thereafter drilled by defendant on the strip in controversy with the High Gravity Company, and the only objection made was that during the drilling of the first (which seems to have been below the top edge of the cliff) plaintiff's manager said to the defendant, "I think you are drilling a well for us." An attempt in equity to enforce such a claim, after several more have been drilled "for us," and against a driller who has always claimed in adverse right, is not strongly appealing. As against this situation we cannot give controlling effect to the old fences, about which there is some proof. They may well have been built to keep cattle from coming through gaps between the higher land and the lower land, and without demonstrating any intent to claim title up to the fence. They are not located according to the theory of either party as to the dividing line.

[5, 6] We know of no rule of pleading prevailing in federal courts of equity which requires the defense of agreed location of a disputed line to be alleged in the answer. This fact constitutes evidence interpreting the title papers; but, even if the effect of the defense depends in the end on the principles of estoppel, and if under some circumstances it might not escape the statute of frauds, as to the legal title to the fee, a court of equity would not award relief as between lessees in the face of such a state of facts.

The decrees below, dismissing both bills, are affirmed.