GULF OIL CORPORATION ET AL V. MARATHON OIL COMPANY ET AL.

No. 7648. Decided April 30, 1941.
Rehearing overruled June 25, 1941.
(152 S. W., 2d. Series, 711.)

60

H. L. *Stone,* of Pittsburg, Pa., *John E. Green, Jr.,* of Houston, *Robt. T. Neill,* of San Angelo, *W. E. Allen, Wm. L. Wise* and *Peveril O. Settle,* all of Fort Worth, for plaintiff in error.

It was error for the court to hold that there is no evidence of a boundary agreement between the two companies, because the undisputed evidence shows that, the line between the two leases never having been marked on the ground, and its location being doubtful and uncertain, the line approximately 200 feet east of Gulf's well No. 1 was established by agreement of the parties, and at all times since has been used as the dividing line between the two leases. Hoxey v. Clay, 20 Texas 582; Harn v. Smith, 79 Texas 310, 15 S. W. 240; Shelor v. Humble Oil & Refining Co., 103 S. W. (2d) 207.

On the question of plaintiffs being estopped from taking the oil under its transfer or division orders. Willis v. Smith, 72 Texas 565, 10 S. W. 685; Burnett v. Atterberry, 105 Texas 119, 145 S. W. 582.

*A. M. Gee,* of Finlay, Ohio, *Johnson & Crumpton,* of Fort Stockton, *Walter S. Howe* and *Richard F. Burgess,* of El Paso, *Wm. Pannill* and *R. C. Gwilliam,* of Houston, and *Myron A. Smith* and *Smith & Smith,* of Fort Worth, for defendants in error.

The evidence was insufficient as a matter of law to show any boundary agreement. The line between the two properties used by the parties was used because they believed it to be the true line and not an agreed line. Kennard v. Maxwell, 287 S. W. 60; Davidson v. Pickard, 37 S. W. 374; Colquitt v. Gulf Prod. Co., 52 S. W. (2d) 235.

*F. H. DeGroat,* Duluth, Minn., *John M. Davenport* and *Charles Gibbs,* of San Angelo, filed briefs for the Douglas Oil Company.

*C. H. Wharton,* of Houston, and *Mark McGee,* of Fort Worth, filed briefs as amici curiae.

MR. JUDGE SMEDLEY of the Commission of Appeals delivered the opinion for the Court.

Marathon Oil Company (formerly named Mid-Kansas Oil & Gas Company) and The Ohio Oil Company sued Gulf Oil Corporation, Gulf Production Company and Gulf Refining Company for the title and possession of the oil and gas leasehold estate in a tract of land 1930 varas in length north and south and 1100 feet in width east and west, alleged to be a part of Section 33, Block 194, G. C. & S. F. Ry. Co. in Pecos County, and for the value of 7/8th of the oil produced and taken by the

Gulf Companies from nine wells on said tract. The Marathon and Ohio Companies were joined in the suit by a number of other persons and corporations owning royalty interests in said Section 33, who sued to recover the value of their proportionate parts of the royalty oil.

At the time the nine oil wells were drilled by it on the area in controversy, Gulf Production was the owner of the oil and gas leasehold estate in Section 28 in Block 194, which section lies immediately west of Section 33, the oil and gas leasehold estate in which was owned one-half by Mid-Kansas Oil & Gas Company and one-half by Transcontinental Oil Company and wholly operated by the Mid-Kansas Company. The area in controversy is within Section 33 under this court's decisions in Turner v. Smith, 122 Texas 338, 61 S. W. (2d) 792; Douglas Oil Company v. State (California case) 122 Texas 377, 61 S. W. (2d) 807; Douglas Oil Company v. State (Whiteside case) 122 Texas 369, 61 S. W. (2d) 804; and Federal Royalty Company v. State (Whiteside case) 128 Texas 324, 98 S. W. (2d) 993. The Turner-Smith suit, the first of said cases, was filed in district court on July 27, 1927, and was decided by this court on May 13, 1933. Eight of the nine oil wells on the area in controversy herein were drilled and completed in the years 1927 and 1928 and the ninth well was drilled and completed in 1929.

The Gulf Companies in defense of the suit rely upon agreed boundary and estoppel. They alleged in their answer that the boundary line between Section 28 and Section 33 had not been marked on the ground and that there was doubt and uncertainty as to the location of said dividing line between said section; that in order to settle upon a dividing line for the drilling of wells along the east side of Section 28 and the west side of Section 33, the engineers of Gulf Production Company and of Mid-Kansas Oil & Gas Company met and agreed upon the said dividing line, agreeing that the same would be located where the engineers of the Mid-Kansas Company contended that it should be located, that is, approximately 200 feet east of the Gulf Production Company's well No. 1 location and approximately 50 feet farther west than the location of the division line as it had been determined by the engineers of Gulf Production Company; that it was further agreed that the wells of the lessees of Section 28 and 33 should be located and drilled with respect to said line; that in reliance upon said agreement Gulf Production Company drilled its wells along

the east side of Section 28 in reference to said line; that Mid-Kansas located and drilled its wells along the west side of Section 33 with respect to said agreed division line; and that the agreement was adopted, ratified and acted upon by the two corporations.

The trial court instructed the jury to return a verdict in favor of the Gulf Companies as to the leasehold estate and a verdict in favor of the owners of royalty interest against the Gulf Companies, rendered judgment that Marathon Oil Company and The Ohio Oil Company take nothing as to the leasehold estate and take nothing in their suit for the value of 7/8th of the oil produced and taken, and rendered judgment in favor of the owners of the royalty interest for their proportionate parts of the value of 1/8th of the oil.

The trial court prepared and filed an elaborate summary of the case in which he expressed the conclusion that, while the Gulf Companies did not establish an express agreement locating the boundary line between the two sections, an agreement upon the common boundary line was proven by necessary implication from the acts and conduct of the two lessees, Mid-Kansas Oil & Gas Company and Gulf Production Company.

The Court of Civil Appeals reversed the trial court's judgment with respect to the leasehold estate and rendered judgment in favor of The Ohio Oil Company and Marathon Oil Company against the Gulf Companies for the 7/8th leasehold estate and for $537,732.96 for oil produced and taken from the wells, and modified and affirmed the trial court's judgment with respect to the royalty interest, rendering judgment in favor of those who sued as owners of royalty against the Gulf Companies for the total sum of $207,174.39. 130 S. W. (2d) 365. The Court of Civil Appeals held that there was no evidence of an agreement between Gulf Production Company and Mid-Kansas Oil & Gas Company fixing the boundary line, that if it could be said that a parol agreement was made, it was unenforceable because it was based upon a mutual mistake of fact and that the Mid-Kansas Company and its successors in title, by acquiescing in the use of a line as a boundary line between the two sections and by so representing it and by drilling wells with reference to it, were not estopped from asserting ownership to the true west line of Section 33.

1   The rules with respect to the establishment of boundary by agreement are well settled by the decisions in this State and by

other authorities. There is no real difference about them in the briefs of the parties to this suit. They may be stated generally and briefly as follows: When there is uncertainty, doubt or dispute as to where the true division line between the lands of the parties may be, they may fix it by parol agreement, which will be mutually binding upon them, even though they were mistaken as to the true location of the line. This is true whether the mistake be of a matter of fact or of law. The existence of uncertainty, doubt or dispute is essential to the validity of such agreement. Actual dispute, however, between the parties, is not necessary. It is enough that the location of the line has not been definitely established and is doubtful or uncertain. It is generally held that such agreement to be effective and binding must be executed by the parties, that is, by the erection of physical monuments on the agreed line or by otherwise marking the line, by actual possession or use to the line, or by the improvement or development of the property with reference to the line. Agreement fixing a boundary may be proven as well by acts and conduct of the parties as by express statement. In this State it is not necessary "in order to give the agreement vitality that it should be supported by acquiescence or acts from which an estoppel may spring." (Lecomte v. Toudouze, 82 Texas 208, 214, 17 S. W. 1047, 27 Am. St. Rep. 870). Acquiescence in a line over a period of several years is evidence from which it may be inferred that the parties had agreed to the line, but it is not conclusive evidence of that fact. Mere acquiescence in another line than the true line will not support a judgment in favor of such other line, when there is no evidence, other than such acquiescence, of an agreement fixing the line and when it is affirmatively shown that the use of the line resulted not from agreement but from a mistaken belief of the parties that it was the true line. Hoxey v. Clay, 20 Texas 582; Coleman v. Smith, 55 Texas 254; Cooper v. Austin, 58 Texas 494, Harn v. Smith, 79 Texas 310, 15 S. W. 240; Grawunder v. Gotoskey, 204 S. W. 705; Sammann v. Dietrich, 39 S. W. (2d) 647; Tide Water Oil Company v. Hale, 92 S. W. (2d) 1102; Schelor v. Humble Oil & Refining Company, 103 S. W. (2d) 207; Atlantic Oil Producing Co. v. Hughey, 107 S. W. (2d) 613; Bohny v. Petty, 81 Texas 524, 17 S. W. 80; Schunior v. Russell, 83 Texas 83, 18 S. W. 484; Lecomte v. Toudouze, 82 Texas 208, 17 S. W. 1047; 8 Texas Law Review, p. 610; Patrick v. Smith, 90 Texas 267, 38 S. W. 17; Farmers' State Bank & Trust Company v. Gorman Home Refinery, 273 S. W. 694, affirmed in 3 S. W. (2d) 65; Hefner

v. Lockhart & Downing, 57 Texas 576, 580; Kiefer Oil & Gas Company v. McDougal, (U. S. C. C. A.) 229 Fed. 933, Ann. Cas. 1916D, p. 343; High Gravity Oil Company v. Southwestern Petroleum Company, (U. S. C. C. A.) 290 Fed. 370; Galbraight v. Lunsford, 87 Tenn. 89, 9 S. W. 365, 1 L. R. A. 522; Stier v. Latreyte, 50 S. W. 589; Hunter v. Malone, 49 Texas Civ. App. 116, 108 S. W. 709; Thompson v. Allen, 111 S. W. (2d) 791; Storey's Equity Jurisprudence, (14th Ed.) Vol. 1, pp. 192-194; Note 69 A. L. R., pp. 1433, 1443, 1459, 1485, 1508; Note 113 A. L. R. pp. 423, 425, 432, 437; 11 C. J. S., Boundaries, pp. 636--642, Sections 64a-68; 8 Am. Jur., pp. 797-804, Sections 72-81.

The Gulf Companies in defense of the suit contend that the undisputed evidence proves the making of a valid and enforceable agreement by Mid-Kansas Oil & Gas Company and Gulf Production Company fixing the boundary line between Section 33 and Section 28, in which the two companies respectively owned the leasehold estates or interests. For reply to such defense the Marathon and Ohio Oil Companies present the following several propositions:

(1) The doubt or uncertainty necessary to the validity of a boundary agreement is wanting, because the Mid-Kansas Company and the Gulf Company, acting independently, had decided to accept the Dod method of locating Block 194 and there was therefore no doubt or uncertainty in the minds of the parties with respect to the boundary line between the two sections.

(2) There is variance between the pleadings of the Gulf Companies and the proof, in that the agreed line described in the pleadings is located 50 feet west of a line extended south from the California Company's northeast corner of Section 28, whereas the evidence conclusively shows that the line actually used by the Mid-Kansas Company and the Gulf Company is the line extending south from said northeast corner of Section 28.

(3) No boundary agreement was made because the evidence conclusively proves that the line used by the parties was so used because of their belief, formed as the result of independent investigations, that it was the true line, and the engineers of the parties merely acted upon instructions from their

respective employers, given because of such belief, to use that line in making well locations.

(4) The existence of a boundary agreement is negatived by correspondence that passed between the officials of the Mid-Kansas Company and the Gulf Company.

(5) The alleged boundary agreement is ineffective on account of the nonjoinder of Transcontinental Oil Company, which owned an undivided one-half interest in the leasehold estate in Section 33, and of the State and other royalty owners.

We have reached the conclusion, after careful examination of the record, that the evidence establishes as a matter of law the making and execution of a boundary agreement valid and binding upon the owners of the two leasehold estates. Such conclusion is, we think, as it must be, supported by the testimony of witnesses whom the Marathon and Ohio Companies offered and by undisputed oral testimony and documentary evidence.

The first question to be considered is whether there was uncertainty as to the location of the division line between Sections 28 and 33 in Block 194 to serve as a predicate or basis for an enforceable boundary agreement. Block 194 is an office survey made in the year 1883. The field notes of sections in the block calls for adjoinders on the west of Block 194 with corners and the east lines of the eastern tier of sections in Block Z, T. C. Ry. Co., for adjoinders on the south with corners and the north lines of the northern tier of sections in Block 178, T. C. Ry. Co., for adjoinders on the north with corners and the south line of the Runnels County school land survey, and for adjoinders on the east with corners and the west lines of sections in Block 1, I. & G. N. R. R. Co. In the year 1886 the Commissioner of the General Land Office deleted, or caused to be deleted, the calls in the field notes of sections in Block 194 for the Runnels County school land and for the sections in Block 1, I. & G. N. R. R. Co.

This deletion and the facts on the ground, as developed by a resurvey made in the years 1918 and 1919 by Captain R. S. Dod, State Land Surveyor acting under appointment by the Commissioner of the General Land Office and under the direction of the Commissioner, caused great doubt and uncertainty as to the true location of the lines and corners of the

sections in Block 194. Dod's two elaborate reports are contained in the statement of facts and they well illustrate that doubt and uncertainty. Dod in his resurvey did not undertake to mark on the ground the location of the corners of the sections in Block 194. He was primarily concerned, as far as that block was concerned, with locating the east line of the block from corners on the west and determining the relation of that line to the west line of Block 1, I. & G. N. R. R. Co. He did not mark the division line between Sections 28 and 33.

After Dod's final report was approved by the Commissioner of the General Land Office, there continued to be uncertainty and differences of opinion among engineers, officials, lawyers, judges and courts as to the correct method of locating the lines and corners of the sections in Block 194 until the Turner-Smith case was decided by this court on May 13, 1933. Turner v. Smith, 122 Texas 338, 61 S. W. (2d) 792. It is enough, without elaboration of such uncertainty and differences, merely to refer to the history of that suit and of the two Douglas Oil Company cases, as it is written in the several opinions of this Court and of the courts of civil appeals (122 Texas 377, 61 S. W. (2d) 807; 122 Texas 369, 61 S. W. (2d) 804; 128 Texas 324, 98 S. W. (2d) 993), to the fact that the Chief Justice of this court dissented in each of said three cases, positively expressing his approval of what is generally known as the Dod method of construction rather than the Turner method of construction approved by the court, and to the further fact that the State of Texas by its attorney general advocated the Turner method in the Turner-Smith suit and by another attorney general advocated the Dod method in the case last above cited, usually referred to as the Whiteside case.

In the Turner-Smith case and the two Douglas Oil Company cases this court was required to determine which of four methods was the correct method of locating Block 194 on the ground. The three methods most strongly urged and generally discussed were: First, the Turner method, to construct the block of sections by course and distance east from the east line of Block Z, rejecting all calls for adjoinder with senior surveys on the south, north and east of the sections in Block 194 lying east of Block Z; second, the Dod method, to construct the block by giving effect to the calls for the east line of Block Z but also by giving effect to the calls for adjoinders with corners of sections in Block 178 to the south of the Block 194, which method gives to the north and south lines of the sec-

tions in Block 194 excessive lengths to satisfy the calls for the corners of the sections in Block 178; third, to construct the block by giving effect to all calls for adjoinders, including those for the sections in Block 1, I. & G. N. R. R. Co., and for the Runnels County school land.

According to the testimony of Kennedy, engineer for the Mid-Kansas Company, the conversation which the Gulf Companies contend resulted in an express agreement locating the division line between Sections 28 and 33 was held in a camp of the Mid-Kansas Company in the oil field in the last part of July or the first part of August, 1927. The conversation was between Kennedy and Woodbury, who was chief engineer of Gulf Production Company. Prior to that time a conference of engineers of the several oil companies owning leases in the field was held in Fort Worth about June 25 or 27, 1927. Woodbury and Collier, Mid-Kansas Company's engineer under whom Kennedy worked, participated in that conference. There the several engineers, including one representing the California Company, owner of a lease on Section 34, Block 194, discussed the several methods of locating Block 194, to determine what method should be used for the development of their leases, and, according to Collier's testimony, "the idea was to conform as near as possible to the Dod theory of locating the lines, that being, of course, the taking up the matter of the excess that they thought was in Block 194, * * * the excess east and west."

The testimony of Fleming, who was vice-president of Mid-Kansas Company and under whom Collier worked, clearly shows that he was fully informed as to the uncertainty with respect to the location of the lines of the sections of Block 194, that he, kept in touch with the engineers, knew that different theories were discussed and knew of the efforts of the engineers to locate the lines on the ground. He testified that his engineers discussed with him the various methods of locating the leases and the surveys and that, while he "didn't know whether the Dod method was going to be correct or not" he accepted that method of locating his company's leases on the ground because his "engineers felt that was the best one to go by."

After the Mid-Kansas Company brought in the discovery well in the Yates oil field, in which the area in controversy is situated, Gulf Production Company filed with the Railroad Commission, on July 19, 1927, notice of intention to drill its well No. 1 on Section 28, describing the location of the well as

being 990 feet south of the north line and 250 feet west of the east line of the section. The location designated was in accordance with the undertaking of operators in the field, by common consent or by agreement, to use 250 feet from property lines for offsetting wells. Pierce, the Gulf Company's engineer, acting under instructions from Woodbury, who thought the Dod method was a good equitable method, made the location for the Gulf Company's No. 1 well on Section 28. He undertook to locate the well 250 varas farther west than the northeast corner of Section 28 as marked by the California Company.

Thereafter Kennedy made a location for Mid-Kansas Company well No. 2 on Section 33, as an offset to the Gulf well No. 1, at a point 500 varas east of the location Pierce had marked for the Gulf well, so that the two wells were each 250 feet from the common line. Several days later the engineers of Mid-Kansas Company reached the conclusion that the location made by Pierce for Gulf well No. 1 was approximately 200 varas rather than 250 varas west of the east line of Section 28 when located according to the Dod method. Then followed the conversation between Woodbury and Kennedy at the Mid-Kansas Company camp in the last part of July or first part of August, 1927, about the division line between the sections. At the end of the discussion, in which Woodbury contended for the correctness of the location which had been made by Pierce and Kennedy contended that Woodbury and Pierce had crowded the division line approximately 50 feet, Woodbury agreed with Kennedy's construction, that is, that the excess should be prorated through the block, allowing Section 33 its proportionate part of the excess, and that, to give effect to that construction, the line should be moved 50 feet west. The difference between Woodbury and Kennedy apparently was caused, in part at least, by Woodbury's belief that a proper application of the Dod method would give no excess to Section 33. Pursuant to the agreement made by Kennedy and Woodbury, Collier and Kennedy moved the location of Mid-Kansas well No. 2 one hundred feet west from the location first staked for it. It is apparrent from Collier's testimony that the Mid-Kansas well was moved 100 feet west, instead of moving both wells 50 feet west, because the Gulf well was already drilling.

Kennedy testified that he had talked with Fleming about the location of the line and that Fleming was anxious to get something definite about it. Fleming, in answer to a question whether Kennedy had trouble when he went down to locate

the west boundary line of the Mid-Kansas Company's Smith-Taylor property, answered that he thought they all had trouble. He testified that just before the time when Mid-Kansas well No. 2 was moved 100 feet west the two companies had been "squabbling" about the line, that the line had not been located on the ground to the satisfaction of both parties and that the engineers had a difference there.

The facts that have been detailed, showing that the lines and corners of the sections in Block 194 had never been marked on the ground by an official survey, the deletion of calls in the field notes for adjoiners, the excess distance on the ground and the difficulties in distributing the excess and in reconciling calls for adjoinders developed by the Dod resurvey, the various theories of construction advanced by engineers and lawyers, the conflicting decisions of trial and appellate court, all evidence doubt and uncertainty with respect to the location of all of the lines of the sections in Block 194 east of Block Z amply sufficient to support an agreement fixing the division line between Sections 28 and 33 of the block. But if more than that were needed, it is supplied by undisputed evidence that, when it became important to the Mid-Kansas Company and the Gulf Company, by reason of the discovery of oil, to locate their offsetting wells and thus fix the division line between their properties, they found themselves actually in disagreement and in dispute or "squabble" over the practical application on the ground of the Dod method of construction which both companies believed was good and equitable.

The belief of the two companies that the Dod method of construction was the best method and their decision to adopt it for the development of their properties neither removed the doubt nor negatived the uncertainty. The undisputed evidence, some of which has been set out, proves beyond question that engineers and officers of the two companies were well aware of the difficulties and uncertainties that had been developed by surveys, that these and the several methods of construction advocated had been subjects of conference and discussion among them, and that, while they believed in the Dod method, still they were uncertain, not knowing which method of construction would finally be approved by the courts. The record does not support the proposition that there was no doubt or uncertainty in the minds of the parties with respect to the boundary line between the two sections.

Before setting out other evidence than that already referred to relating to the agreement as to the division line, we shall consider the Marathon and Ohio Companies' proposition that there is a variance between the Gulf Companies' allegations and the proof with respecet to the agreed boundary line. The proposition is that the agreed line described in the pleadings is a line 50 feet west of a line extended south from the California Company's northeast corner of Section 28, as shown on maps prepared and used by the engineers of the Gulf Company and by the engineers of the Mid-Kansas Company, whereas the undisputed evidence proves that the line actually used by Gulf Production Company and Mid-Kansas Oil & Gas Company, and with reference to which their wells were drilled, is a line extending south from the California Company's northeast corner of Section 28 and not a line 50 feet farther west.

The proposition cannot be sustained because it rests upon an erroneous interpretation of the pleadings. The allegations of the Gulf Companies as to the agreement are in substance that the engineers of Gulf Production Company surveyed a line for the east line of Section 28 and located its well 250 feet west of that line and that, after difference and discussion as to the correctness of that line arose, the two companies agreed upon a line which was approximately 50 feet west of the line first surveyed and contended for by Gulf Production Company and approximately 200 feet east of the location of the Gulf Company's well. It is further alleged that thereafter the Mid-Kansas Company and Gulf Production Company ratified and adopted the line thus agreed upon and drilled their wells with reference to that line. There is no allegation that the line as first surveyed and contended for by Gulf Production Company was a line extending south from the Calofornia Company's northeast corner of Section 28 and there is no allegation that the agreed line was a line 50 feet farther west than the California Company's corner.

It is true, as stated in the briefs of the Marathon and Ohio Companies, that Gulf Production Company, Mid-Kansas Oil & Gas Company and the California Company tentatively, at least, had approved the Dod method of constructing Block 194; that the California Company had made a survey in its application of that method and marked a corner for the northeast corner of Section 28; that the Gulf Company's engineer Pierce had been instructed to make a location for Gulf No. 1

well from that corner; and that, after the conference between the engineers, the division line used for the drilling of all of the offset wells by Gulf Production Company and Mid-Kansas Oil & Gas Company was the line extending south from the California Company's marked northeast corner of Section 28 as shown on the maps made and used by the engineers of the two companies. The undisputed evidence further shows, however, that Pierce made a mistake in locating Gulf Company's well No. 1. Why he made the mistake is unimportant. The fact remains that he did so make his survey for the location as to place the east line of Section 28 fifty feet farther east than the California Company's northeast corner of the section as above described. It was Pierce's location of the division line that Woodbury contended for in his conference with Kennedy and it is the line thus surveyed by Pierce that is referred to in the Gulf Companies' pleadings as the line surveyed and run out the east line of Section 28 when the location for Gulf well No. 1 was made and as the line placed by Gulf Production Company's engineers from which the agreed line was 50 feet west.

It is to be observed also that the agreed line is described in the pleadings, not only by reference to the line first surveyed and contended for by Gulf Production Company, but also by reference to the Gulf Company well No. 1 location. The pleadings describe it as being approximately 200 feet east of that location. The evidence which has been discussed shows that pursuant to the agreement the location of Mid-Kansas well No. 2; offset to Gulf well No. 1, was moved west 100 feet so that the two wells would be, the one 200 feet east and the other 200 feet west of the agreed division line. This line, midway between the two wells, was thereafter used as the division line for the drilling of all other wells and it is, as evidenced by the maps in the record, the line which extends south from the point marked by the California Company for the northeast corner of Section 28.

Reference has been made to the conversation between Kennedy and Woodbury about the division line between the two sections, in the Mid-Kansas camp the latter part of July or the early part of August, 1927, at the end of which conversation Woodbury agreed with Kennedy's construction, and following which the loaction of the Mid-Kansas well No. 2 was moved 100 feet west from that first staked for it. The facts stated are taken from Kennedy's testimony on direct examina-

tion. The well location was thus changed in order that the division line would conform to Kennedy's construction with which Woodbury agreed, the effect being to move the line 50 feet west from its position midway between Gulf well No. 1 and Mid-Kansas well No. 2 as first located. On cross examination Kennedy thus testified: "Q. Well, did you and Mr. Woodbury agree upon moving that line 50 feet east (obviously west was meant), is that your testimony? A. Yes sir. Q. You did agree upon it? A. Yes sir. Q. And then you moved your location west a hundred feet? A. Yes sir." After testifying that he staked the location of Mid-Kansas well No. 4 or well No. 12, Kennedy answered "Yes sir" to the question: "And you staked that location with reference to that line that you and Mr. Woodbury agreed upon, didn't you?" He also gave an unqualified affirmative answer to the question: "Now, that line you and Mr. Woodbury agreed upon between the Gulf lease on the M. A. Smith lease and the Mid-Kansas Oil & Gas Company Smith-Taylor lease, the line you agreed upon was between those two wells after you moved your Smith-Taylor No. 2 over a hundred feet? Is that correct—that is correct, isn't it?" Kennedy further testified that Smith-Taylor well No. 2 was located and drilled "in reference to that line you (the witness) and Mr. Woodbury agreed upon."

On August 29, 1927, Fleming, vice-president of Mid-Kansas Oil & Gas Company, sent to Adams, general agent of Gulf Production Company, the following telegram: "Your telegram. It is our understanding your location and ours originally made 250 feet from common line but our engineer met yours on ground and moved our location 100 feet west to absorb excess, making both locations 200 feet from common line. Our understanding your engineer agreed to this and supposed you have been notified. Advise if satisfactory." When interrogated about the telegram, Fleming testified that by "common line" he meant the line between the two leases.

The Mid-Kansas Company's notice of intention to drill its well No. 2 offsetting the Gulf Company's well No. 1, was filed with the Railroad Commission August 20, 1927. The notice describes the location of the well as being 200 feet east of the west line of Section 33. It was drilled at approximately that distance east of the agreed division line between Sections 28 and 33. Thereafter during 1927 and 1928 the Mid-Kansas Company drilled other wells, eight in all, in two rows, east and within 1000 feet of the agreed division line; and Gulf Pro-

74

duction Company likewise during the same period drilled two rows of wells, eight in all, west and within 1000 feet of the agreed division line. In September 1929 the Gulf Company drilled its well No. 21 331 feet west of the agreed line and the Mid-Kansas Company drilled its well No. 19 a like distance east of that ·line. Each notice of intention to drill filed with the Railroad Commission by the Mid-Kansas Company described the location of the well as being a stated distance east of the west line of Section 33; and each notice of intention filed by the Gulf Company described the location of the well as being

a stated distance west of the east line of Section 28. All of the wells were drilled at substantially the same distances from the agreed line as the distance from the section lines given in the applications, except that the notice for Gulf well No. 1, which was filed July 19, 1927, describes the well as 250 feet west of the east line of Section 28 and the well was drilled approximately 200 feet west of the agreed line.

· The location of the wells as drilled in relation to the agreed line is shown by the accompanying sketch, and from the sketch it was apparent that the nine wells drilled by Gulf Production Company are within Section 33 under the decision in the Turner-Smith case, for according to that decision the line between the two sections is more than a thousand feet west of the agreed line.

The wells on the west side of the division line appearing on the sketch were completed as producers and operated by Gulf Production Company and the oil produced from them was run by the Gulf Companies; and in like manner the wells on the east side of that division line were completed as producers and the oil was produced and run from them by the Mid-Kansas Company. Never from the time the first wells were drilled in 1927 until the final decision of the Turner-Smith case in 1933 did the Mid-Kansas Company or anyone acting for it dispute Gulf Production Company's ownership of the wells on the west side of the line or its right to produce and take oil therefrom. The brief filed by the Marathon and Ohio Companies in the Court of Civil Appeals contains this statement:

"Prior to the Turner-Smith decisions the Mid-Kansas recognized to the fullest extent the Gulf's ownership of the tract of of land involved and the Gulf's right to produce oil therefrom and appropriate the proceeds of the sale thereof."

The same brief in a discussion of the proration agreement made in 1927 contains the following:

"In carrying out this agreement the wells in controversy here were drilled as Gulf wells. About this there is no dispute. It is also undisputed that the Mid-Kansas never objected prior to the decision of the Supreme Court in the Turner case to the right of the Gulf to produce and market oil from the wells and to have these wells included and prorated under the proration plan as Gulf wells."

From the latter part of the year 1927 until July 1, 1928, the oil produced in the Yates oil field was prorated under agreements of the operators and for the making and performance of such agreements the Yates Pool Operators Committee was created. Fleming was a member of the committee and was usually present at its meetings representing the Mid-Kansas Company and Adams was a member and attended the meetings as representative of the Gulf Companies. Under these agreements a potential. method of proration was used until January 1, 1928, when an acreage method was adopted and used until July 1, 1928. On the date last named the Railroad Commission put into effect rules for the proration of the oil produced in the field on a unit basis, which rules were formulated and recommended by the Yates Pool Operators Committee. The order provided for the administration of the plan of proration by the Railroad Commission through an advisory committee composed of members selected by representatives of the operating companies. Under this plan the several sections were divided into units of approximately 100 acres each and the allowable production for the units was determined by a combination of the potential method and the acreage method.

In the conferences of representatives of the operators and the Operators Committee in connection with the making and administration of the proration agreements and in the administration of the plan put into effect by the Commission's order, a map prepared by engineers of the Mid-Kansas Company was used. This map is referred to in the brief of the Marathon and Ohio Companies as "the proration map." It shows the divison line between Section 28 and 33 at the place fixed by Kennedy and Collier, after Kennedy's agreement with Woodbury, with the Gulf wells on the west side of the line and the Mid-Kansas wells on the east side of the line, as they appear on the sketch above copied herein.

The same location is given to the division line between Sections 28 and 33 by two maps, which the operators caused to be prepared for use in proration under agreement and under the Railroad Commission's order putting into effect the unit plan. In prorating the oil the nine wells drilled by Gulf Production Company were treated as belonging to that company under its lease of Section 28, and in dividing Sections 28 and 33 into units for proration the agreed line served as the division line between the two sections. And whenever tests

of the wells were made to determine potential production in the administration of the proration agreements and order, the nine wells on the area in controversy herein were tested by a representative of Mid-Kansas Company and the wells on the other or east side of the division line were tested by a representative of the Gulf Company, the tests being so made in accordance with custom prevailing in the field for the satisfaction of the offset operator.

The evidence tends to prove that Woodbury and Kennedy were authorized to make for their principals Gulf Production Company and Mid-Kansas Oil & Gas Company the agreement fixing the division line, but be that as it may, the acts of the principals above detailed, in the use of the agreed line for the drilling of their wells, the development of their leases and the production, taking and proration of the oil, conclusively prove ratification and adoption of the agreement by the principals. The trial court expressed the opinion that agreement by the two companies that the line used was the boundary line was proven by necessary implication from their acts and conduct. It is our conclusion that such acts and conduct, whether sufficient or not of themselves to evidence such agreement, at least afford uncontradicted evidence of ratification and adoption of the express agreement made by the engineers of the two companies.

The Marathon and Ohio Companies correctly concede that when the making of a boundary agreement is proven it cannot be invalidated merely because it was based upon or induced by mutual mistake of the parties in respect to the location of the true line, citing among other authorities, Harn v. Smith, 79 Texas 310, 15 S. W. 240 23 Am. St. Rep., 340. Releying, however, upon Thompson v. Allen, 111 S. W. (2d) 791, Hunter v. Malone, 49 Texas Civ. App., 116, 108 S. W. 709 and similar decisions, the Marathon and Ohio Companies take the position that acquiescence in the line, even over the period of approximately six years, furnished no evidence of a boundary agreement because the use of the line resulted from the common belief of the parties that it was the true line and did not result from an agreement. The authorities and the rule announced by them are not applicable in the instant case, because, as has been said, the making of an express boundary agreement is established by undisputed evidence and, in our opinion, it clearly appears from the evidence that the acquiescence and use of the line resulted from that agreement. Kennedy, engineer for the Mid-Kansas Company, knew that Fleming was anxious to get

something definite about the division line. Kennedy made an agreement with Woodbury making the line definite. In execution of that agreement the location of Mid-Kansas well No. 2 was moved and thereafter all of the line wells were located and drilled with respect to the line agreed upon.

Gulf Production Company, Mid-Kansas Oil & Gas Company and the California Company, acting in part independently and in part as the result of conferences of their engineers, had decided to accept the Dod method as being the best of several methods. for locating the section in Block 194. In the conference of engineers held in Fort Worth on June 25 or 27, 1927, it was tentatively agreed, or to use Collier's words, "the idea was to conform as near as possible to the Dod theory of locating the lines." In this there was no completed agreement as to the location on the ground of any particular division line or lines between any of the sections, but when the time came to mark the locations for the offsetting wells and thus. to fix the division line between Sections 28 and 33, Woodbury and Kennedy entered into an agreement for their companies which definitely located the line on the ground and that agreement was ratified and acted upon by the two companies. The engineers were not merely following instructions to use a line believed to be correct. The undertook to make and did make, as Kennedy testified, an agreement as to the division line between the two leases.

Since the necessary uncertainty existed and the agreement was made and executed, the parties who made the agreement, or who ratified the agreement made by their engineers, are concluded by it although it may have been induced by a belief that the line agreed upon was the true line or would be sustained as the true line. Hoxey v. Clay, 20 Texas 582; Coleman v. Smith, 55 Texas 254, 259; Cooper v. Austin, 58 Texas 494; Tide Water Oil Co. v. Hale, 92 S. W. (2d) 1102; Shelor v. Humble Oil & Refining Co., 103 S. W. (2d) 207; Atlantic Oil Producing Co. v. Hughey, 107 S. W. (2d) 613.

It is our opinion, after carefully considering the telegrams and letters in the record between representatives of Mid-Kansas Oil & Gas Company and Gulf Production Company, that such correspondence does not negative the existence of a boundary agreement but evidences confirmation and approval of the agreement. It is argued that a letter written by Woodbury on August 12, 1927, referring to the meeting of engineers in Fort Worth held June 25 or 27 shows that Woodbury did not

interpret his transaction with Kennedy as the making of an agreement, since he expressed the opinion that the location of the boundary lines was properly to be settled by investigation. The letter, like the conference, dealt with the general problem for all of the producers in the field as to the boundary lines of many surveys, more particularly the sections in Block 1, I. & G. N. R. R. Co. and not with the ground location of any certain division line between two sections, as Sections 28 and 33. There is nothing in the letter inconsistent with the existence of the oral agreement theretofore made as to this division line.

The substance and meaning of the several telegrams that passed between Adams and Fleming from August 29 to September 1, 1927, are as follows: Adams, not being advised of the agreement made by the engineers, but learning that Mid-Kansas well No. 2 had been moved 100 feet west, protested against that change. Fleming in answer explained that the engineers of the two companies had met on the ground and moved the location 100 feet west to absorb excess, making both locations 200 feet "from common line" and added that he understood the Gulf Company's engineer had agreed to this and supposed Adams had been notified. This telegram establishes the fact that Fleming had been advised of the agreement upon the common line and that he gave it his approval. Adams, still not advised (as his telegram and the undisputed evidence show) of the relocation of the line by Kennedy and Collier pursuant to the agreement, wired Fleming a withdrawal of his protest, thus giving his approval to the change already accomplished in the location of the Mid-Kansas well No. 2, which made both wells 200 feet from the common line.

On September 7, 1927, Adams wrote Fleming suggesting that all parties holding leases on Sections 28, 33 and 34 in Block 194 should enter into a formal agreement fixing the location of certain lines and corners, which he carefully described by a connection to a corner of Section 61 in Block 1, I. & G. N. R. R. Co. and by courses and distances. He expressed the opinion that it would be advisable to have all royalty owners as well as the lease owners join in the agreement. On September 16, 1927, Fleming wrote Adams, referring to the proposed agreement and stated that the Mid-Kansas Company's engineers had arrived at a description of the lines under discussion. The letter then sets out a description by metes and bounds which checks with that contained in Adams' letter except for a difference of six-tenths of a vara in the distance from the west line of Section 61 to the northeast corner of

Section 33 and a difference of 9 varas in the distance between the northwest corner of Section 33 and the northeast corner of Section 28. The two letters describe identical lines for the division line between Sections 28 and 33, that is, a line located 1887.4 varas west of the west line of Section 61, Block 1. This line thus described in the two letters is, according to the engineers who testified for both parties and the maps prepared and used by the engineers of the two companies, the very line with reference to which all of the line wells were drilled. These letters, therefore, are further evidence of Fleming's and Adams' acceptance and approval of the line agreed upon.

The agreement discussed in the letters was never consummated. The letters are not reasonably construed as an intended or attempted repudiation of the boundary agreement already made. They make no reference to that agreement. They are consistent with it because they describe and intend to use as the division line between Sections 28 and 33 the line theretofore agreed upon. They contemplate the making of a more formal agreement to include another line and other corners and to be executed by additional parties, but it is not suggested in the letters that such proposed more comprehensive agreement should supersede the prior oral agreement as to the one line.

We do not find in the correspondence that passed between Adams and Fleming in May, 1930, any evidence tending to prove that the nine line wells in controversy herein were drilled upon a full assumption of the hazards growing out of the pending Turner-Smith suit. Those wells were drilled long prior to May, 1930. The correspondence of that date did not relate to them. Line locations referred to in the letters were locations of wells proposed to be drilled on another section in 1930. Adams' letters in May of that year were about an authorized location for a well in the northeast corner of Section 22, the final statement in his last letter being that his company would assume "whatever risks may exist in the drilling of *this* location." (Our italics.)

Transcontinental Oil Company owned a one-half interest in the leasehold estate in Section 33 at the time the boundary agreement was made in 1927 by Gulf Production Company and the Mid-Kansas Oil & Gas Company, which ownership continued until the Transcontinental Company on August 14, 1930, assigned all of its properties to the Mid-Kansas Company. It is contended by the Marathon and Ohio Companies that the

boundary agreement was ineffective because the Transcontinental Company did not join in it. The record contains an operating agreement executed before 1927 by the Transcontinental Company and the Mid-Kansas Company, by the terms of which the Mid-Kansas Company was given full control over the lease on Section 33, and other leases jointly owned and to be acquired by the two companies, for development, operation, production and disposition of oil produced. It is apparent from undisputed evidence in the record that the representatives of the Mid-Kansas Company, in making the boundary agreement and by their acts which ratified the agreement, assumed to act as representing the entire leasehold estate or interest in Section 33. In the meetings of representatives of lessees to formulate and administer plans for prorating the oil produced from the wells, Fleming was usually present for the Transcontinental Company and the Mid-Kansas Company. The Transcontinental Company necessarily was advised of the development of the lease on Section 33 by the Mid-Kansas Company and knew of the drilling of the wells which were located and drilled with refreence to the agreed line and in the execution of the agreement, and the record contains no suggestion of any objection by it to the use of that line. Transcontinental Oil Company is not a party to this suit and none of the oil for which judgment was rendered by the Court of Civil Appeals in favor of the Marathon and Ohio Companies as owners of the leasehold estate in Section 33 was produced during the period of the Transcontinental Company's ownership of an interest in the lease. Under such state of facts the Marathon and Ohio Companies cannot, by reason of Transcontinental Company's nonjoinder in the agreement, avoid the boundary agreement made, executed and acted upon by their predecessor in interest, Mid-Kansas Oil & Gas Company.

2  The further contention is made that the boundary agreement was ineffective, even as to the parties who made it, because the lessors and royalty owners were not parties to it. We are cited to no authority and find none, holding that owners of adjoining oil and gas leasehold estates may not, unless joined by the lessors and royalty owners, make agreements, valid and binding upon the parties to the agreements, fixing the division lines between their leasehold estates. In High Gravity Oil Co. v. Southwestern Petroleum Co. (U. S. C. C. A.) 290 Fed. 370, it was held that a boundary agreement made by oil leases was valid and that they were bound by it. The opinion contains no discussion of nonjoinder by lessors and royalty owners.

In this State oil and gas lessees are owners of estates in land. There is in our opinion no good reason to forbid such owners from definitely determining by agreement, for themselves and to the extent of their estates and interests, the location of the division line between their estates, for the development and protection of their properties and to avoid the uncertainty and delay incident to litigation and the difficulty, delay and often the impossibility of procuring agreement on the part of royalty owners.

If an agreement so made by lessees has the effect of making one boundary line for the lessees and another for the lessors or royalty owners, the result is not different from that following an assignment of his lease by one lessee to an adjoining lessee in so far as the lease covers an area of land adjoining the assignee's lease. Both the Gulf Company's lease on Section 28 and the Mid-Kansas Company's lease on Section 33 permit such assignments as to part of the leased land.

We approve the decision and judgment of the Court of Civil Appeals in favor of the owners of royalty interests. Those who owned royalty interests in Section 33, other than the Mid-Kansas Company, were not parties to the oral boundary agreement; they did not locate and drill the wells with reference to the agreed line; nor were they parties to other acts and conduct of the lessee Mid-Kansas Oil & Gas Company, above discussed, by which the boundary agreement was ratified and confirmed.

3 The Mid-Kansas Company as lessee "was invested with the exclusive right of possession and development" and accordingly was authorized to select locations for the drilling of wells on the leased land. Shell Petroleum Corporation v. Railroad Commission, 137 S. W. (2d) 797. But the lease did not by its terms give the lessee authority to make boundary agreements for the royalty owners, nor do we think such authority is to be implied merely from the relation of lessor and lessee, for every valid boundary agreement, unless it happens that the agreed line is the true line, will in its effect divest one of the parties to the agreement of title to a strip of land.

Certain of the owners of royalty in Section 33, Peerless Oil & Gas Company, Mid-Kansas Oil & Gas Company, and Southland Royalty Company, became owners of royalties in Section 28 and as such executed division and transfer orders. The argument is made by the Gulf Companies that these orders, which certified and guaranteed that the parties executing them were

the owners of certain interests in "the production from wells Nos. 1 and up on Section 28," ratified the M. A. Smith lease of Section 28 as covering the wells in controversy, and that those who executed such orders are estopped, by the statements and declarations in them and by accepting payments thereunder, from claiming ownership of oil produced from the wells as owners of royalty interests in Section 33.

4. It has been held that the execution of a division order and the acceptance of payments under it operate as ratification of the lease referred to in the order. Texas & Pacific Coal & Oil Co. v. Kirtley, 288 S. W. 619; Bearden v. Texas Co., 41 S. W. (2d) 447, 463, 464; affirmed in 60 S. W. (2d) 1031, (Com. App.). Those decisions, however, concern the validity of the lease contracts and not the boundary of the leased land. The division orders in evidence herein made no reference to boundary or to division lines and contain no provisions relating to definite location of wells or to adjoining properties. The phrase "the production from wells Nos. 1 and up on Section 28" undertakes neither to designate any certain wells nor to describe their location. It is a brief method of expressing ownership of a part of the production from all of the wells drilled or to be drilled on the leased land. We conclude that the parties who executed the division orders and transfer orders did not by the execution of them ratify either the agreement or the acts of the lessees fixing the boundary.

5 Estoppel cannot be predicated upon the execution of the division and transfer orders or upon the acceptance of payments under them, because the orders contain no representations as to boundary and because it is not shown that the Gulf Companies suffered loss on account of the execution of the orders or relied upon them in making payments. The evidence is that the Gulf Companies made no payments under the division orders or transfer orders (except to Douglas Oil Company, which recovered no judgment for royalty oil) unless indemnity bonds or agreements were executed.

6 We also agree with the ruling of the Court of Civil Appeals that recovery by royalty owners of the value of oil produced and run more than two years before the suit was filed is not barred by limitation. The Gulf Companies had no interest in the royalty oil or in its proceeds and asserted no adverse claim to the royalty oil or its proceeds. They held the proceeds (except the payments made as above stated) for the owners, awaiting the termination of litigation affecting Section 28.

In view of the fact that Mid-Kansas Oil & Gas Company was a party to the boundary agreement pursuant to which the wells on the area in controversy were drilled, a difficult question is presented as to the right of the Marathon and Ohio Companies, successor of Mid-Kansas Oil & Gas Company, to recover the value of a portion of the royalty oil taken from the wells. We have reached the conclusion, however, that the judgment in favor of the Marathon and Ohio Companies as owners of an interest in the royalty in Section 33 should be affirmed by reason of the following facts: The Mid-Kansas Oil & Gas Company owned none of the royalty interest in Section 33 until Peerless Oil & Gas Company on November 2, 1931, conveyed to it an 86/640 interest. When the boundary agreement was made and the wells in controversy were drilled, and when most of the acts of ratification were performed, the Mid-Kansas Oil & Gas Company was the owner of only the leasehold interest in Section 33. In the execution and ratification of the boundary agreement the Mid-Kansas Company acted as lessee, and the agreement was intended to affect, and did affect, the leasehold estate or interest and not the royalty interest in Section 33. Had Peerless Oil & Gas Company continued to be the owner of the 86/640th royalty interest that it conveyed to the Mid-Kansas Company it would have been entitled to recover that proportion of the value of the royalty oil. The Gulf Companies made no claim to the ownership of the royalty oil.

The judgment of the Court of Civil Appeals in favor of The Ohio Oil Company and Marathon Oil Company and against the Gulf Oil Corporation, Gulf Production Company and Gulf Refining Company for the mineral leasehold estate in the land described in that judgment and for the sum of $537,732.96 with interest, as the value of oil produced from the land, is reversed; and the judgment of the district court, that The Ohio Oil Company and Marathon Oil Company take nothing against the above named Gulf Companies as to the mineral leasehold estate in the land described in the trial court's judgment and in the judgment of the Court of Civil Appeals, and that The. Ohio Oil Company and Marathon Oil Company take nothing by their suit for recovery of 7/8th of the oil and gas and the value thereof produced and run by the said Gulf Companies from the wells on the said land is affirmed. That part of the judgment of the Court of Civil Appeals which reformed and affirmed the judgment of the district court in favor of the plaintiffs in the district court suing as royalty owners and against the

above named Gulf Companies is affirmed. Three-fourths of the costs incident to the appeal to the Court of Civil Appeals are taxed against The Ohio Oil Company and Marathon Oil Company and one-fourth against Gulf Oil Corporation, Gulf Production Company and Gulf Refining Company, and all costs in this court are assessed against The Ohio Oil Company and Marathon Oil Company.

Opinion adopted by the Supreme Court April 30, 1941.

Rehearing overruled June 25, 1941.