# IN THE SUPREME COURT OF TEXAS

No. 19-0233

CONCHO RESOURCES, INC., ET AL., PETITIONERS,

v.

MARSHA ELLISON D/B/A ELLISON LEASE OPERATING, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

**Argued January 5, 2021**

JUSTICE LEHRMANN delivered the opinion of the Court.

This case is principally a trespass-to-try-title suit between the lessees of adjacent mineral estates. The plaintiff alleges that the defendants drilled several wells either on the plaintiff's leasehold or closer to the lease line than Railroad Commission rules allow. The defendants, relying on a boundary stipulation between the fee owners of the two mineral estates and the plaintiff's written acceptance of the stipulation, claim that the plaintiff ratified the agreed boundary line, foreclosing the trespass claims. The trial court granted summary judgment for the defendants, but the court of appeals reversed, holding that the boundary stipulation is void and thus may not be ratified. We hold that the boundary stipulation is valid and that the defendants conclusively established their ratification defense. Accordingly, we reverse the court of appeals' judgment.

## I. Background

J.D. Sugg died in 1925, and his family assumed ownership of a 640-acre tract of land in Irion County known as Section 1. In 1927, the Suggs conveyed a portion of Section 1 to nearby landowners, the Noelkes, as part of a land swap. The 1927 deed described the conveyed land, referred to hereafter as the northwest tract, as "All of Survey 1, Block 6, H & T.C. Ry. Co. [i.e., Section 1] lands located North and West of the public road which now runs across the corner of said Survey, containing 147 acres, more or less." In 1930, the remainder of Section 1, referred to hereafter as the southeast tract, was conveyed to A.A. Sugg by partition deed, which describes the land as "Abstract 312, Survey 1, Original Grantee H. & T.C. Ry. Co., Block 6, 493 acres." The actual acreage of the portion of Section 1 located north and west of the public road referenced in the 1927 deed is 301 acres (not 147), and the actual acreage of the portion located south and east of the public road is 339 acres (not 493).

The northwest tract was conveyed multiple times, and by 1987 the tract's mineral estate was owned by the Pilon family trust and three other individuals (collectively, the Pilons). That year, the Pilons granted oil-and-gas leases to Questa Oil & Gas Co., as lessee, covering the northwest tract. The leases described the tract as a "147 acre tract of land out of [Section 1], lying N and W of the public road which runs NE and SW across said [Section], and being same land conveyed [by the 1927 deed]." Questa drilled a well (the Pilon Well #1) located near the northwest corner of the tract. In its application for a permit to drill the well, Questa certified that the Pilon leases covered 320 acres. In 1996, after a series of assignments, the Pilon leases were assigned to Jamie Ellison d/b/a Ellison Lease Operating, which became the designated operator of the Pilon Well #1. Ellison's filings with the Railroad Commission and signs posted on the

2

property similarly described the leases as comprising 320 acres. Around the same time the leases were assigned to Ellison, William and Carol Richey, as trustees of the Richey Living Trust, acquired the fee interest in the northwest tract's mineral estate.

Meanwhile, the southeast tract passed through the estate of A.A. Sugg,[1] and by April 2006 the tract's mineral estate was owned by several members of the Sugg and Farmar families (collectively, the Farmars).[2] On April 13, 2006, the Farmars granted an oil and gas lease to Samson Resources Company[3] covering numerous tracts, including "493 [acres]" in the "South part of [Section 1]."

In October 2006, Samson obtained a drilling title opinion acknowledging several issues relating to the southeast tract. The opinion outlined problems with the original 1930 deed, which described the southeast tract as containing 493 acres but provided no indication of the location of the acreage. Further, the opinion advised that the 1927 deed described the northwest tract as being in the form of a triangle (based on the location of the public road), but that the description of the southeast tract in subsequent deeds "would lead a surveyor to assume that this land is in the form of a rectangle lying in the South part of Section 1, which would be incorrect."

---

[1] A 2005 property tax receipt from A.A. Sugg, Jr. described the tract as containing 339 acres.

[2] One of the deeds in that chain of title was a gift mineral deed dated April 4, 2006, in which Philip Farmar conveyed his interest in the mineral estate to his children, Nancy Farmar Warfield, Andrea Farmar Bjeldanes, Peter D. Farmar, and Steven S. Farmar. The deed described the tract as "All of the South 493.0 acres in Section 1 . . . , being a tract of land lying South and East of the public road which runs NE and SW across [Section] 1, containing 493.0 acres, more or less."

[3] Several Samson entities are named as defendants in this suit, including Samson Resources Company, Samson Lone Star Limited Partnership (which merged with Samson Lone Star LLC), Samson Lone Star LLC (which changed its name to Samson Exploration LLC), and Samson Exploration LLC. The entities are collectively referred to herein as Samson.

Samson's surveyor prepared a preliminary survey plat that credited 493 acres to the southeast tract, including 154 acres of land north of the public road.[4]

In December 2006, Samson notified Ellison and the Richeys of its desire to drill a well (the Sugg Well #1) on Section 1, approximately 100 feet south of the public road. Notwithstanding the preliminary survey crediting the disputed 154 acres north of the public road to the southeast tract, Samson requested that Ellison and the Richeys waive any objection to Samson's application for a "Rule 37 spacing exception"—that is, an exception to the Railroad Commission rules' general prohibition against drilling a well within 467 feet of a lease line. *See* 28 TEX. ADMIN. CODE § 3.37(a)(1). Ellison and the Richeys agreed to the waiver, and Samson drilled the Sugg Well #1 in 2007.

In 2008, Samson's landman, Tim Reece, prepared a Boundary Stipulation of Ownership of Mineral Interest between the Farmars (owners of the southeast-tract mineral estate) and Carol Richey (owner of the northwest-tract mineral estate). The stipulation referenced the 1927 and 1930 deeds' conveyances, describing the Farmars as "the current owners of the minerals under the 493 acre tract" and Richey as "the current owner of the minerals under the 147 acre tract." The stipulation stated that "a question has arisen among the Parties as to the physical location of the 147 acre tract and the ownership in the mineral estate in [Section 1]" and that the Parties desired to "declare, stipulate, acknowledge, and establish of record the location of the 147 acre tract and the 493 acre tract in the mineral estate." The stipulation went on to declare the

---

[4] In August 2007, A.A. Sugg, Jr. (who owned the southeast tract's surface estate) executed a warranty deed conveying to the Richeys the "surface estate only" of the portion of Section 1 "that lies Northwest of County Road 411 [the public road referenced in the 1927 deed], the East boundary being the East survey line of Section 1, the West boundary being the West boundary line of Survey 1, the North boundary being the South boundary line of the property owned by [the Richeys], and the South boundary being County Road 411." The deed further stated that "the total number of acres shall be considered 154."

4

boundary of the mineral estate in accordance with the boundary line contained in the Samson survey. In other words, the parties stipulated that the disputed 154-acre tract was part of the southeast tract. The parties signed the stipulation in August and September 2008, but it purported to be "effective, for all purposes, as of July 8, 1987" (the date the Pilon leases were executed). The stipulation was recorded in the Irion County property records on October 3, 2008.

On October 16, 2008, Reece sent a letter to Ellison Lease Operating enclosing the stipulation and requesting that Ellison "signify your acceptance of the description of the Richey 147 acre tract as set out in the Stipulation (your leasehold), by signing both copies of this letter in the space provided below and return one copy to my attention in the enclosed self-addressed envelope. Upon your acceptance, a more formal and recordable document will be provided." The letter noted that Samson "plan[s] to spud the Sugg 1 #3 well . . . in the next 30 days." Jamie Ellison countersigned the letter on October 22, and Reece averred that he received it in late October 2008. The "more formal and recordable document" referenced in the letter was never provided.

Samson subsequently drilled three more wells, two of which are at issue in this suit along with Sugg Well #1: Sugg Well #3, which was drilled on the disputed tract north of the public road; and Sugg Well #4, which is not on the disputed tract but would violate Railroad Commission spacing requirements if the public road is the boundary. The following map, also included in the court of appeals' opinion, provides a helpful visual:

5



In December 2010, Samson assigned its lease to Three Rivers Acquisition, LLC (referred to, along with affiliated entity Three Rivers Operating Company LLC, as Three Rivers). Three Rivers recompleted Sugg Wells #1, #3, and #4 in 2011. In 2012, Three Rivers assigned the lease to COG Operating LLC (referred to, along with affiliated entity Concho Resources, Inc., as Concho).

Beginning in November 2010, Sunoco Partners Marketing & Terminals LP entered into a series of arrangements with the successive operators of the Sugg wells pursuant to which it purchased the oil produced from those wells. Under those arrangements, Sunoco[5] was responsible for paying the sales proceeds to the respective operator—first Samson, then Three

---

[5] References to Sunoco include both Sunoco Partners Marketing & Terminals LP and its general partner, Sunoco Logistics Partners Operations GP LLC.

Rivers, then Concho—and the operator assumed responsibility for paying the proper portion of those proceeds to the appropriate interest owners.

Jamie Ellison died in 2011, and his wife Marsha continued to maintain the Pilon leases. On June 21, 2013, Marsha Ellison d/b/a Ellison Lease Operating (hereafter, Ellison) filed suit against Samson, Three Rivers, and Concho,[6] alleging that the Pilon leases cover all land in Section 1 located north and west of County Road 411 and that the 2008 boundary stipulation and the 2008 letter signed by Jamie Ellison had no impact on Ellison's legal title under those leases. Ellison sought a declaratory judgment to that effect and also brought claims for trespass to try title, trespass to real property, conversion, unlawful drainage, gross negligence, and nonpayment of oil and gas proceeds under Texas Natural Resources Code section 91.404 (the division-order statute).[7] Ellison later amended the petition to add Sunoco as a defendant with respect to the claims for conversion and violations of the division-order statute. Concho counterclaimed for, among other things, breach of contract and a declaratory judgment premised on the signed 2008 letter. Ellison and Samson settled, but Sunoco filed a crossclaim against Samson seeking indemnity for Ellison's claims against Sunoco.

Three motions for summary judgment on Ellison's claims were filed by the various defendants. Concho and Three Rivers filed a motion arguing that, by virtue of the signed 2008 letter, Ellison relinquished any claim of ownership of the disputed 154-acre tract, ratified the boundary line established by the 2008 stipulation, and waived any right to a leasehold interest in the disputed tract. Sunoco filed a motion arguing in part that it is not a statutory "payor" that

---

[6] Ellison also sued S/D Oil and Gas Corporation, but the claims involving that defendant were severed and dismissed, and they are not before us.

[7] Ellison also initially asserted claims for negligence per se and violations of the Texas Theft Liability Act. However, her second amended petition—the operative pleading in this case—does not include those claims.

may be held liable under the division-order statute and that the statute of limitations bars the conversion claim. Because of Sunoco's pending indemnity claim against Samson, Sunoco and Samson also filed a joint traditional and no-evidence motion for summary judgment with respect to Ellison's claims against Sunoco concerning the time period when Samson operated the Sugg wells. Ellison filed a cross-motion for summary judgment, arguing that she has superior title to the disputed tract under the Pilon leases as a matter of law and that Concho and Three Rivers are bad-faith trespassers.

The trial court granted the defendants' motions and denied Ellison's. The case then proceeded to trial on Concho's counterclaims. The jury found that the 2008 letter constitutes an agreement between Ellison and Samson and that Ellison failed to comply. The jury awarded $1,030 in reliance damages, almost $500,000 in lost profits, almost $400,000 in attorney's fees relating to the contract claim, and over $450,000 in attorney's fees relating to the declaratory judgment claim. The trial court rendered a judgment on the verdict with respect to the liability finding, the award of reliance damages, and the award of attorney's fees attributable to the contract claim. The trial court rendered judgment notwithstanding the remainder of the jury's verdict, ordering that Concho recover nothing in lost profits or in attorney's fees attributable to the declaratory judgment claim. Finally, the judgment incorporated the trial court's summary judgment rulings dismissing Ellison's claims with prejudice, declaring that the 2008 boundary stipulation is enforceable, and declaring that the boundary between the Pilon and Sugg leases "is the same as the common boundary line between [the northwest and southeast tracts] as identified in" the stipulation. Ellison appealed, and Concho cross-appealed the portions of the judgment that did not conform with the jury's verdict.

8

The court of appeals reversed, holding that Ellison established as a matter of law both that she has superior title to the disputed tract and that Concho is a bad-faith trespasser. 609 S.W.3d 549, 565 (Tex. App.—Corpus Christi–Edinburg 2019). In light of its holding regarding title, the court of appeals also reversed the judgment on Concho's counterclaims and held that a genuine issue of fact exists as to the conversion claim against Sunoco. *Id.* at 565–66. On the division-order-statute claim against Sunoco, the court held that a fact issue exists as to whether Sunoco is a "payor" under the statute and that a four-year statute of limitations applies to the claim. *Id.* at 569. The court rendered judgment granting Ellison's motion for summary judgment, denying all relief on Concho's counterclaims, and remanding the case to the trial court for further proceedings. *Id.* Concho and Three Rivers, Samson, and Sunoco all filed petitions for review, which we granted.[8]

## II. Discussion

We begin with the trial court's summary judgment in Concho's favor on Ellison's trespass-to-try-title claim because resolution of that claim is potentially dispositive of Ellison's remaining claims against all the defendants. We review an order granting summary judgment de novo, generally taking as true all evidence favorable to the nonmovant and indulging every reasonable inference in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When, as here, the parties file cross-motions for summary judgment and the trial court grants one and denies the other, we "consider both sides' summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have

---

[8] Texas Oil and Gas Association submitted an amicus brief in support of the petitioners, and Texas Land Title Association submitted an amicus letter in support of Ellison.

rendered." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010).

Concho primarily argues that the trial court correctly granted summary judgment on Ellison's trespass-to-try-title claim because Concho has conclusively established its ratification defense. *See Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010) ("A defendant who . . . conclusively establishes an affirmative defense is entitled to summary judgment."). Specifically, Concho contends that, by signing the 2008 letter "signify[ing] [his] acceptance of the description of the Richey 147 acre tract as set out in" the boundary stipulation, Jamie Ellison—and Marsha as his successor—ratified the stipulation as a matter of law. Alternatively, Concho argues that the 2008 letter creates a fact issue on whether Ellison waived her claims, requiring a remand rather than rendition of judgment in Ellison's favor.

In rendering judgment for Ellison, the court of appeals held that the boundary stipulation is void and thus incapable of being ratified. 609 S.W.3d at 562. The court held that the stipulation is not itself a conveyance of the disputed acreage but is "close in nature to a 'correction deed' in which a party seeks to retroactively correct . . . some 'ambiguity or error'" in the original deed. *Id.* at 561 (quoting TEX. PROP. CODE § 5.027(a)). Examining the 1927 deed, the court held that it unambiguously conveyed "all" of the tract northwest of the public road (which includes the disputed tract), notwithstanding the inconsistent general acreage description. *Id.* at 560 (citing *Stribling v. Millican DPC Partners, LP*, 458 S.W.3d 17, 21–22 (Tex. 2015) (holding that a specific metes-and-bounds description controls over a conflicting general acreage call unless it is clear from the deed's language, read in light of the surrounding circumstances, that the parties intended the general description to control)). The court further held that "the

10

evidence in the record suggests that the defendants were aware that the public road was the true boundary" and that no "bona fide uncertainty or doubt [existed] as to the location of the boundary." *Id.* at 562. Accordingly, the court held that the 1927 deed contains no "ambiguity or error" to correct, that the boundary stipulation is "invalid and void," and that the 2008 letter could not ratify the stipulation. *Id.* As to waiver, the court of appeals held that Ellison raised issues of fact by presenting summary judgment evidence that Ellison continued to assert ownership of the disputed acreage even after Jamie signed the 2008 letter. *Id.* at 563.[9]

### A. Ratification

"Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 678 (Tex. 2000) (citation and internal quotation marks omitted). The defense "rests upon a manifestation of assent to confirm one's prior act or that of another." *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex. 1980); *see also Ratification*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A person's binding adoption of an act already completed but either not done in a way that originally produced a legal obligation or done by a third party having at the time no authority to act as the person's agent."). However, under longstanding common law, "a 'void' act" is "'not susceptible of ratification.'" *Wood v. HSBC Bank USA, N.A.*, 505 S.W.3d 542, 547 (Tex. 2016) (quoting *Cummings v. Powell*, 8 Tex. 80, 85 (1852)).[10]

---

[9] Despite holding that issues of fact existed on Concho's waiver defense, the court of appeals rendered judgment for Ellison. 609 S.W.3d at 563, 565.

[10] We have said that under certain circumstances, a void deed may be ratified by a formal recognition of its validity. *See Reserve Petroleum Co. v. Hodge*, 213 S.W.2d 456, 459 (Tex. 1948). Because we hold that the

11

Ellison argues that the court of appeals correctly held that the boundary agreement between Section 1's mineral-interest owners is void and that the 2008 letter thus cannot qualify as a ratification of the agreement. We disagree.

On its face, the boundary stipulation addresses a "question [that] has arisen" among the owners of the adjacent mineral estates in Section 1 "as to the physical location" of the northwest tract, and it answers that question by establishing the location of the two tracts and the boundary line between them. Importantly, the record mineral owners of both tracts—the Farmars and Richey—agreed to resolve the identified boundary issue in accordance with the stipulation. *See Houston Oil Co. of Tex. v. Singleton*, 44 S.W.2d 479, 481 (Tex. 1931) (holding that a controversy regarding which of two surveys established a boundary line was settled by one party's execution of an instrument agreeing to the line in one of the surveys and the other party's acceptance of the instrument). We have said that such "settlements of boundary are common, approved, and encouraged by the courts, and ought not to be disturbed," regardless of whether "it was afterwards shown that they had been erroneously settled." *Levy v. Maddux*, 16 S.W. 877, 878 (Tex. 1891).

The court of appeals concluded that the 1927 deed is objectively unambiguous as to the "true" location of the boundary line—the public road—and that the mineral owners' agreement to establish the line elsewhere in accordance with the Samson survey is thus null and void. 609 S.W.3d at 562.[11] Concho argues that imposing this "objective uncertainty" requirement "would

---

stipulation was not void, we need not address whether a contrary holding would summarily foreclose Concho's ratification defense.

[11] As noted, the court of appeals described the boundary stipulation as "close in nature to a 'correction deed' in which a party seeks to retroactively 'correct the defects and imperfections' of the original deed." 609 S.W.3d at 561 (quoting *Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 750 (Tex. 2009)). Unlike correction deeds, which are governed by Texas Property Code sections 5.027–.030, the boundary stipulation does

scuttle boundary agreements as a mechanism to avoid litigation" because parties will never know whether their informal settlement of a boundary dispute is effective until it is declared so by a court. We agree.[12]

The Farmars and Richey could have gone to court to obtain a determination of the location of the boundary between their mineral estates. Had they done so, perhaps the court would have concluded, as Ellison contends and the court of appeals held, that the 1927 deed is unambiguous, the inconsistent acreage calls are immaterial, and the public road is the boundary line. But they chose to resolve the "question" that had "arisen" about the boundary location informally by executing the stipulation. *See Levy*, 16 S.W. at 878 (noting that "agreements of a recent date, where there was doubt, and whether the parties were right or wrong in their belief that the line they established and agreed upon as the boundary of their land was precisely where it ought to be, have been encouraged, favored, and upheld"). We see no reason to second-guess the owners' decision to bind themselves in that manner without resorting to litigation.[13]

---

not purport to "replace[]" either the 1927 deed or the 1930 deed. TEX. PROP. CODE § 5.030(b). It is an agreement between owners of adjacent property regarding the location of the boundary between their tracts, and nothing in the statutory provisions governing correction deeds affects the validity of such an agreement.

[12] In *Gulf Oil Corp. v. Marathon Oil Co.*, we stated that "[w]hen there is uncertainty, doubt or dispute as to where the true division line between the lands of the parties may be, they may fix it by parol agreement, which will be mutually binding upon them, even though they were mistaken as to the true location of the line." 152 S.W.2d 711, 714 (Tex. 1941). The court of appeals cited *Gulf Oil* to support its conclusion that the lack of any objective uncertainty about the boundary line renders the stipulation invalid. *See id.* ("The existence of uncertainty, doubt or dispute is essential to the validity of such agreement."). However, the court of appeals also recognized that *Gulf Oil* "by its nature" applies "to cases involving express *oral* boundary agreements or *implied* boundary agreements," neither of which is at issue here. 609 S.W.3d at 561 (emphasis added). In any event, *Gulf Oil* mandates "doubt or uncertainty *in the minds of the parties*," not objective ambiguity in the relevant conveyance instruments. 152 S.W.2d at 718 (emphasis added).

[13] The court of appeals stated that "evidence in the record suggests that the defendants were aware that the public road was the true boundary." 609 S.W.3d at 562. However, the defendants were not parties to the boundary stipulation. Further, the evidence the court cited does not support its conclusion. For example, the court stated that if the public road were not the "true" boundary, then Samson's 2006 request that Ellison and Richey agree to a Rule 37 spacing exception for the Sugg Well #1 "makes no sense and serves no purpose." *Id.* Given the concerns raised by the title opinion, however, the exercise of such caution before drilling makes perfect sense.

Ellison argues that, by stating an effective date of July 8, 1987, the stipulation purports to retroactively and impermissibly bind Ellison to the mineral owners' stipulated boundary line. Amicus Texas Land Title Association similarly argues that condoning such retroactive changes will inject uncertainty into deed records and call into question the standard interpretation of legal descriptions. We agree, and Concho does not dispute, that the boundary stipulation could not by itself retroactively bind others who had an interest in the tracts and were not parties to the agreement. Nor, until it was recorded, could the agreement provide constructive notice to subsequent purchasers. *See Singleton*, 44 S.W.2d at 481 (holding that the appellees, who acquired title with full knowledge of a written instrument executed by their predecessor-in-interest agreeing to a boundary line in settlement of a controversy regarding the line's location, were bound by that agreement); TEX. PROP. CODE § 13.001(b) (an "unrecorded instrument [reflecting a conveyance of or interest in real property] is binding on a party to the instrument, on the party's heirs, and on a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument").[14] Thus, while we hold that the boundary stipulation is a valid agreement between the mineral owners of the two tracts at issue,[15] it does not bind Ellison to the agreed boundary line.

However, as discussed, in October 2008, Reece (Samson's landman) sent Ellison a letter, with the boundary stipulation enclosed, requesting that Ellison "signify your acceptance of the description of the Richey 147 acre tract as set out in the Stipulation (your leasehold), by signing

[14] Indeed, even a valid correction deed, which is "effective as of the effective date of the recorded original instrument of conveyance," is subject to the interests of creditors and purchasers who acquired their interests, without notice, after the date the original instrument was executed and recorded but before the date the correction deed was executed and recorded. TEX. PROP. CODE § 5.030(a)(1), (c).

[15] We need not reach Concho's alternative argument that the boundary stipulation was effective as a conveyance.

14

both copies of this letter in the space provided below and return one copy to my attention." Jamie Ellison signed the letter and returned it to Reece, thereby confirming his acceptance of the boundary line agreed to in the stipulation as the leasehold boundary,[16] even though he was not legally required to do so. *Fortune Prod. Co.*, 52 S.W.3d at 678. And Samson did not begin drilling north of the public road until after the letter was signed.

Ellison argues that, even if the boundary stipulation *could* have been ratified, the signed letter is not a valid ratification because Jamie Ellison was fraudulently induced into signing it by Reece's misrepresentations. *See Denton v. English*, 157 S.W. 264, 266 (Tex. App.—San Antonio 1913, no writ) ("The law favors agreements as to boundaries, which are fairly made, but it condemns fraud in obtaining such an agreement just as it would any other agreement obtained by fraud."). But we see no record evidence of such misrepresentations. It is true that the letter describes the stipulation as being "dated July 8, 1987," presumably in reference to the effective date chosen by the parties who signed it. But the stipulation itself was enclosed with the letter, and the parties manifestly executed the stipulation in 2008. The letter does not communicate that Ellison was required to accept the boundary line in the stipulation, nor does the letter contain any representations about the legal effect of the stipulation. To the extent that Ellison relies on evidence of conversations between Reece and Jamie Ellison before he signed the letter, the only evidence of the content of those conversations is Reece's affidavit, in which he averred that "Mr. Ellison acknowledged to me his understanding that Ellison Lease Operating's lease from Richey

---

[16] The fact that the letter does not use the word "ratify" is immaterial. Jamie Ellison agreed to accept the description of the northwest tract ("your leasehold") contained in the boundary stipulation. In doing so, he accepted the boundary line contained in the stipulation, even though he was not a party to it.

15

consisted of only 147 acres and otherwise comported with Suggs' and Richey's understanding of the common boundary between the parties."

Ellison also notes the letter's statement that "[u]pon your acceptance, a more formal and recordable document will be provided." She contends that Jamie Ellison's acceptance of the stipulation's boundary line was only for the limited purpose of executing the "more formal and recordable document," which never occurred. However, we agree with Concho that this reading is inconsistent with the letter's text, which requests that Ellison "signify your acceptance of the description of the Richey 147 acre tract as set out in the Stipulation (your leasehold)" by counter-signing *the letter*. It does not ask Ellison to accept the stipulation by signing a future document, nor does it purport to condition his acceptance on the execution of such a document. *See Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108–09 (Tex. 2010) (explaining that a "condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation" and that, absent the use of conditional language, a term will be construed as a promise rather than a condition if such a construction is reasonable). We do not view the absence of the contemplated "more formal and recordable document" as fatal to Concho's ratification defense.

Finally, at various points throughout the litigation, Ellison has raised the possibility that Jamie's signature on the 2008 letter was forged. She points to no evidence in the record supporting this assertion but argues that, at a minimum, she is entitled to a remand to conduct discovery on that issue in the trial court. However, Ellison did not file a verified denial of that point as the procedural rules require. TEX. R. CIV. P. 93(7). Nor is there any indication that she filed a verified request for a continuance to further explore the issue. *See* TEX. R. CIV. P. 166a(g)

16

("Should it appear from the affidavits of a party opposing the motion [for summary judgment] that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.").

We hold that, in light of the valid boundary stipulation and the signed 2008 letter, Ellison as a matter of law ratified the boundary line contained in the stipulation as the boundary of Ellison's leasehold.

### B. Additional Legal Arguments

Ellison raises several additional arguments in support of her trespass-to-try-title claim that we address in turn. First, Ellison argues that equitable defenses like ratification are categorically unavailable in a trespass-to-try-title action.[17] We disagree. The procedural rules provide that, upon pleading "not guilty" in a trespass-to-try-title suit, "the defendant may give in evidence any lawful defense to the action except the defense of limitations, which shall be specially pleaded." TEX. R. CIV. P. 789. As a general matter, we have held that such a plea allows the defendant to "interpose any legal *or equitable* defense that tends to defeat the plaintiff's right to recover." *Kauffman v. Brown*, 18 S.W. 425, 427 (Tex. 1892) (emphasis added); *see also Hancock v. Booker*, 608 S.W.2d 811, 815 (Tex. App.—Waco 1980, writ ref'd n.r.e.) (same) (citing *Guest v. Guest*, 12 S.W. 831 (Tex. 1889) (holding that estoppel is a valid defense to a trespass-to-try-title claim)).

---

[17] To the extent Ellison frames the issue as one of Concho's "standing," we agree with Concho that standing has nothing to do with the availability of equitable defenses. Ellison, not Concho, is the trespass-to-try-title plaintiff who must establish standing to assert her claim.

Ellison relies on *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76 (Tex. 1989) (*Rogers I*), to support her assertion regarding the unavailability of equitable defenses, but that reliance is misplaced. In *Rogers I*, we said only that the defense of *laches*, which is premised on a plaintiff's unreasonable delay in asserting claims, "is not a defense in a trespass to try title suit where the plaintiff's right is based on legal title." *Id.* at 80. We said nothing about any other equitable defense. Ellison further claims that we foreclosed ratification as a trespass-to-try-title defense in a subsequent appeal in the same case. *See Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 769–70 (Tex. 1994) (*Rogers II*). Again, Ellison is mistaken. In *Rogers II*, we rejected the jury's ratification finding because the evidence did not support it, not because the defense was categorically unavailable. *Id.*

Next, Ellison contends that abandonment of title to real property is not recognized in Texas.[18] On that point, she is correct. *Rogers I*, 772 S.W.2d at 80. However, Concho is not claiming that Ellison abandoned her title. *See Trenolone v. Cook Expl. Co.*, 166 S.W.3d 495, 500–01 (Tex. App.—Texarkana 2005, no pet.) (explaining that "abandonment" of personal property is "the relinquishment of possession of a thing by the owner with the intention of terminating his ownership, *but without vesting it in any one else*" (emphasis added) (quoting *Pearson v. Black*, 120 S.W.2d 1075, 1079 (Tex. App.—Eastland 1938, no writ))). Rather, Concho claims, and conclusively demonstrated, that Ellison ratified the location of the boundary line between Ellison's leasehold and the adjacent leasehold. Ratification is not abandonment.

---

[18] Though Ellison primarily argues that she obtained leasehold title to all 301 acres north of the public road via written conveyance, she alternatively argues that she obtained such title by adverse possession and that title obtained by adverse possession similarly cannot be abandoned.

Ellison also relies on the doctrine of estoppel by deed, which "[i]n the broadest sense . . . stands for the proposition that all parties to a deed [and their privies] are bound by the recitals in it, which operate as an estoppel." *Trial v. Dragon*, 593 S.W.3d 313, 318 (Tex. 2019). This appears to be a modified version of the argument that objective ambiguity is required to justify a boundary agreement. As discussed, adjacent owners are free to resolve uncertainty *amongst themselves* regarding a boundary location. *Singleton*, 44 S.W.2d at 481. The estoppel-by-deed doctrine simply does not apply to written boundary agreements.

Finally, as a general matter, Ellison's briefing paints a picture of an elaborate land-grab scheme orchestrated by Samson. To be sure, the title opinions Samson obtained expressed serious concerns about Samson's leasehold interest, both because of the vague legal description of the "493 acres" in its lease and the deeds passing title to the southeast tract, and because of the 1927 deed's reference to the public road. Further, Samson does not dispute that it drafted the boundary stipulation that the Farmars and Richey signed. But we fail to see how those facts render the stipulation invalid. Moreover, to the extent Ellison asserts that Samson "preyed upon and/or instigated" uncertainty among the mineral owners, there is simply no evidence to support such an assertion. The parties to the boundary stipulation agreed to resolve their uncertainty about the location of the boundary between the mineral estates, and Ellison ratified that boundary location with respect to the leasehold interests. The trial court correctly granted summary judgment in the defendants' favor on Ellison's trespass-to-try-title claim and bad-faith trespass claim.

19

## C. Remaining Claims

Ellison's remaining claims, including her claims for conversion and violations of the division-order statute against Sunoco (for which it seeks indemnity from Samson), hinge on the validity of her trespass-to-try-title claim. Because the trial court correctly granted summary judgment on that claim, Ellison's remaining claims fail as a matter of law. We thus need not address Samson and Sunoco's argument that those claims would fail even if the trespass-to-try-title claim did not.

Finally, with respect to the trial court's judgment for Concho on its counterclaims for breach of contract and declaratory judgment, the court of appeals reversed that portion of the judgment because of the court's erroneous holding regarding Ellison's title. For the same reason, the court of appeals did not address Concho's cross-appeal regarding the portion of the trial court's judgment that declined to award Concho some of the damages and attorney's fees found by the jury. In light of our conclusion about the title claim, we remand the case to the court of appeals to consider the unaddressed issues relating to the counterclaims.

## III. Conclusion

The trial court correctly granted summary judgment for the defendants on Ellison's claims. Accordingly, we reverse the court of appeals' judgment, reinstate the portions of the trial court's judgment incorporating its summary judgment orders, and remand the case to the court of appeals to consider the parties' unaddressed issues regarding Concho's counterclaims.

 

                                         _____
                                         Debra H. Lehrmann
                                         Justice

**OPINION DELIVERED:** April 16, 2021